OPINION OF THE COURT
Jasen, J.
We are asked on this appeal to decide whether evidence of similar crimes allegedly committed by the defendant were properly admitted for the purpose of establishing the defendant’s identity. Additionally, we are asked to consider whether certain statements taken after the defendant had retained counsel were properly admitted into evidence.
Between mid-February and the middle of May, 1978, five young men reported incidents of homosexual assaults to the Binghamton police. In each case, the victim described his attacker as being in his early twenties, approximately 5 feet, 11 inches tall and weighing 160 pounds, with blond hair hanging down around his ears and gold, wire-rimmed, teardrop-shaped glasses. Each young man told the police that he had been approached by the assailant, who offered to share some marihuana with him. These initial encounters all were reported to have occurred in the same general *247 area of Binghamton. After agreeing to share the marihuana, the young men reported that they went with the assailant to isolated locations along the floodwall near the river, or in one case into the football stadium which was similarly nearby and desolate. When they reached their destination, rather than producing the marihuana, the assailant would, according to the reports, overpower his companion, forcing him to engage in French kissing, followed by acts of oral and anal sodomy.
The police, suspecting the defendant on the basis of the victims’ descriptions, began leaving word that he was wanted for questioning. When the defendant heard that the police wanted to question him, he contacted a local attorney. He told the attorney that he thought the police wanted to question him in connection with an incident in which he and another person had had a disagreement which led to some pushing and shoving. He made no mention of any other incident, nor of any sexual aspect to the incident. The attorney advised him to go and speak with the police, but not to sign anything.
At the station house, the defendant was read Miranda warnings and asked about an incident on May 15 when a young man was attacked, although not sexually assaulted. The defendant told the police that he had been attacked by the young man and that he had run away from him.
At that point in the questioning, the attorney whom defendant had consulted called to see if his client had gone to the police station. The attorney spoke with the interrogating officer who told him that the defendant refused to sign the Miranda card and that they were going to question him concerning other similar incidents. The attorney told the officer to tell his client that he could sign the Miranda warning card and could discuss the other incidents, but that he should not sign any statement until his attorney had seen it.
When the questioning resumed, the police told the defendant that they had tried to stop someone matching the defendant’s description to question him concerning an assault on April 11, but the person had run away. The defendant admitted he was that person and stated that he
*248 had run because he was afraid the police wanted him for something. In response, the police said that they had wanted to discuss the recent homosexual assaults. The defendant then attempted to bargain with the police by offering to tell them about the incidents if, rather than charging him with anything, they would allow him to sign himself into a mental hospital. He was told that he would have to be charged. At this point, he indicated that he wished to call his attorney and questioning ceased.
Later that afternoon, a lineup was arranged, at which a partner of the attorney that defendant had contacted was present. Another associate of the lawyer had also been allowed to talk with the defendant earlier in the day. On both occasions, he was told not to talk to anyone and no further statements were made. At the suppression hearing, the defendant sought to suppress his statements which indicated knowledge of the crimes, most particularly his offer to tell the police about them if they let him commit himself to a hospital.
A 12-count indictment was returned stemming from four assaults which involved sodomy and from the attack on the young man not sexually assaulted. A motion for separate trials was made and granted. This appeal arises from the second and fifth trials, both of which resulted in the defendant being convicted of first degree sodomy.
At each trial, the victim identified the defendant as the person who had attacked him. Each also testified that he had accompanied the defendant to these isolated locations after defendant had approached him and offered to share some marihuana. Instead of supplying the marihuana, each testified that the defendant attacked and overpowered him. Although each story of the attack and sexual assault involved slight variations, each testified to a specific scenario which involved French kissing and then oral sodomy followed by anal sodomy.
On cross-examination, defense counsel raised issues concerning the validity of the identification. In response, the People sought the court’s permission to allow several other of the victims to testify so that they might identify the defendant and describe the nature of the attacks against *249 them. The defense objected on the ground that the prejudicial effect of allowing testimony concerning similar crimes allegedly committed by the defendant outweighed the probative value of the testimony.
Trial court allowed the testimony of several of the other victims under what has come to be known as the identity exception first articulated by this court in People v Molineux (168 NY 264). Proper limiting instructions were given to the jury immediately prior to the testimony of each victim and again during the charge. Defense counsel raised further objections, arguing that identity was not in issue to the extent necessary to allow testimony concerning other crimes and that this was not a proper application of the identity exception.
On appeal, the Appellate Division, Third Department, found this argument to be “unconvincing”. (People v Beam, 84 AD2d 653, 654.) That court noted that identity was put into issue by the cross-examination of the victim which raised questions concerning the validity of the identification, and by the defendant’s own testimony, during which he denied any contact with the victim. The nature of the attacks was sufficiently similar, the court reasoned, to allow the testimony for the limited purpose of identification.
In considering the defendant’s claim that statements made by him to the police should have been suppressed because they were taken in violation of his right to counsel, the Appellate Division found that the statements were properly admitted. The majority reasoned that the statements had been voluntarily made by the defendant after consultation with his attorney, and the fact that the defendant had misled his attorney as to the severity of the charges should not inure to the defendant’s benefit by effectively enlarging his right to counsel to include receiving specific advice. Neither did the majority believe that the retaining of counsel imposed an affirmative duty on the police to see that the client has been candid with the attorney when seeking the attorney’s advice.
The dissenter argued that since the police knew the defendant had retained counsel, they could not question *250 the defendant unless he waived his right to counsel. Furthermore, this could only be done by the defendant, not the attorney, and only with the attorney present.
For the reasons that follow, we agree with the majority at the Appellate Division that both the testimony concerning the other assaults and the statements made by the defendant to the police were properly admitted by the trial court. We would also add that, like the Appellate Division, we find no merit to defendant’s other claims that the People failed to prove the use of forcible compulsion as defined by subdivision 8 of section 130.00 of the Penal Law or that that statute is unconstitutionally vague. While it is true that forcible compulsion is an abstract concept, the statute cannot be termed ambiguous. There was adequate evidence in both cases that the defendant used physical force and intimidation in order to force his victims to comply with his desires.
Turning then to the propriety of allowing other victims to testify and identify the defendant as their attacker, it must be noted that this testimony was admitted for the limited purpose of establishing the defendant’s identity and proper limiting instructions were given. The question thus presented is whether the defendant’s modus operandi was sufficiently unique to tend to establish his identity and accordingly make use of the identity exception proper. (People v Molineux, 168 NY 264, supra; People v Condon, 26 NY2d 139; People v Allweiss, 48 NY2d 40; Richardson, Evidence [Prince, 10th ed], § 180, p 149.)
It has long been the general rule that evidence of uncharged crimes is not admissible because it is feared that the jury may convict the defendant not of the crime charged, but rather because of his predisposition to criminal conduct. (People v Molineux, supra, at p 291; People v Condon, supra, at p 143; People v Allweiss, supra, at pp 46-47.) However, when the evidence of the other crimes is relevant to an issue other than the defendant’s criminal tendency, it may be admitted on the basis of an exception to the general rule, but only for the limited purpose for which it is relevant. (People v Allweiss, supra, at p 47; People v Ventimiglia, 52 NY2d 350, 359-360.)
*251 In People v Molineux (supra), this court stated what has come to be known as the five Molineux exceptions to the rule forbidding introduction of evidence of similar crimes. The fifth exception is “when the evidence of an extraneous crime tends to identify the person who committed it as the same person who committed the crime charged in the indictment”. (People v Molineux, supra, at p 313.) But the court was quick to note that this exception was of limited application. The mere fact that similar crimes were committed in a similar manner would not particularly aid in identifying the defendant unless the similarities were unusual enough to compel the inference that the defendant committed both. Thus, the defendant’s modus operandi must be sufficiently unique to make the evidence of the uncharged crimes “probative of the fact that he committed the one charged”. (People v Condon, supra, at p 144; People v Allweiss, supra, at pp 47-48; Richardson, Evidence [Prince, 10th ed], § 180, at p 150.)
The threshold issue is whether or not identity is even an issue in the case. Other jurisdictions have limited the application of this exception and will not allow its use if the defendant’s identity has been established by other evidence. (29 Am Jur 2d, Evidence, § 322, p 373; People v Condon, supra, at p 142; People v Ventimiglia, 52 NY2d 350, supra.) This court, however, in People v Condon (supra), stated the rule in New York as: “[U]nless the defendant’s identity is conclusively established, the identity exception set forth in Molineux should apply to enable the prosecution to adequately prove the defendant’s identity.” (People v Condon, supra, at p 142.)
In this case, we find that the assailant’s identity remained in dispute. It was put into issue by the defense cross-examination of the victim which raised questions concerning the validity of his identification of the defendant and by the defendant’s testimony that he was not the person who had attacked the victim. His own testimony, above all, kept the issue of identity viable. It may seem clear that the victim’s testimony which included verification of the description he had given the police at the time of the attack would be significantly more credible to the jury than the defendant’s assertions that he was not the right *252 man. But this would not remove the issue of identity from the case.
The use of the identity exception was thus proper if it can be said that the alleged conduct was sufficiently unique to be probative on the issue of identity. (People v Condon, supra, at p 144; People v Allweiss, supra, at p 47; McCormick, Evidence, § 190; Richardson, Evidence [Prince, 10th ed], § 180, at p 150.) The defendant contends that the modus operandi supposedly employed amounts to nothing more than the type of activity normally associated with homosexual encounters and thus fails to establish the required uniqueness. A review of the testimony of all the victims indicates that the pattern of these attacks was sufficiently unique to justify the use of the identity exception.
The same essential story was told by each victim, except the one who managed to fight off his assailant. All the victims were young men in their late teens who were approached by a man they described as being approximately 19 or 20. He offered to share some marihuana with each victim, thereby luring him to an isolated location. Three of the young men were approached in the same general area of the City of Binghamton and, with the exception of the young man who went to the football stadium, they went with the defendant to isolated areas along the river. At some point during their initial conversation, the defendant told three of the young men that he was from out of town and on his way elsewhere. When they reached the location chosen by the defendant, he assaulted them’ forcing them to partially disrobe and perform oral sodomy on the defendant. He then forced them to allow him to sodomize them. The scenario in each case concluded with acts of anal sodomy. All the victms also testified that he forced them to engage in French kissing during the encounter. Although there are .minor differences in each attack, the pattern of the initial encounter and the specifics of the sexual attacks, all of which followed the same pattern, indicate a unique modus operandi. While it is true, as defendant contends, that any one individual aspect of the encounter is not unique behavior for a homosexual *253 episode, the over-all pattern does serve to establish this as a modus operandi.
In each case, the initial ruse used to attract the young men was the same, as was the story, in three of the four instances, about defendant being from out of town. Each victim was taken to an isolated location and was then assaulted. The pattern of the assault itself was also sufficiently unique to indicate that one person was responsible. It is not necessary that the pattern be ritualistic for it to be considered unique; it is sufficient that it be a pattern which is distinctive. This is not to say each element of the pattern must be in and of itself unusual; rather the pattern, when viewed as a whole, must be unique. Thus, even though other homosexual attacks might, by chance, follow the same pattern, the pattern used by the defendant in these cases was sufficiently unusual to establish a specific modus operandi, making the evidence of the other attacks highly probative of the assailant’s identity. (People v Allweiss, 48 NY2d 40, supra.)
We turn now to consider defendant’s claim that his right to counsel was violated so that statements made to the police during his interrogation should be suppressed. While these statements do not constitute a specific confession, they do indicate that the defendant had knowledge of the crimes.
It is clear from the facts that the police knew the defendant had an attorney. But it is equally clear that the defendant, on the advice of his attorney, agreed to be questioned without the attorney present. This was then confirmed in the telephone conversation between the interrogating officer and the attorney. We perceive no obligation on the part of the police to seek some form of independent assurance that the decision of the suspect and his attorney to waive the suspect’s right to remain silent and to have his attorney present is good advice. Nor do we perceive any responsibility on the part of the police to assure that the communication between the attorney and the client which led to the decision was open and honest.
The police in this case did everything required to honor the defendant’s right to counsel. When told that he had been instructed by his attorney to come and answer their *254 questions, but not sign anything, it was permissible for the police to infer from the defendant’s conduct that he agreed with his attorney’s advice. The attorney then cannot be said to have waived the defendant’s right to counsel, but rather to have confirmed defendant’s waiver of his right to remain silent and that the waiver was made on the advice of counsel. The right to counsel does not serve as an absolute barrier between the State and the accused; rather, it is designed to insure that individuals have counsel in dealing with the complexities of the legal system. (People v Rogers, 48 NY2d 167; People v Skinner, 52 NY2d 24.) But there are occasions when the best counsel will lead a suspect to waive one of his rights. Plea bargaining in exchange for information is, of course, the most obvious such situation. When a person has had the benefit of counsel and then chooses to waive one of his rights, the police are not required to question the validity of that decision as long as they are assured that the decision was made in consultation with the suspect’s attorney. (People v Cunningham, 49 NY2d 203; People v Bartolomeo, 53 NY2d 225.) Usually such information will come when all the parties, the client, the attorney and the police are present, but there is no requirement of physical presence of the attorney. Such an assurance by the attorney who consulted with defendant is just as valid when made over the telephone. (People v Yut Wai Tom, 53 NY2d 44, 53-54.)
Moreover, in this case, the defendant misinformed his attorney as to the nature of the incident about which the police were seeking to question him. Were we now retroactively to give him the benefit of the advice he might have received had his attorney been fully informed, we would be allowing a distortion of the constitutional right to counsel.
That right is designed to assure that a person have the aid of an attorney when he is dealing with the State. (People v Hobson, 39 NY2d 479; People v Rogers, 48 NY2d 167, supra; People v Skinner, 52 NY2d 24, supra.) We have repeatedly indicated our sensitivity to assuring that an individual’s constitutional right to counsel be afforded the utmost protection. (People v Rogers, supra; People v Samuels, 49 NY2d 218; People v Skinner, supra; People v Bartolomeo, 53 NY2d 225, supra.) Because of our concern that
*255 the individual needs the assistance of counsel in dealing with the State, we have held that once an individual invokes his right to counsel, a waiver of that right will not be deemed voluntary and intelligent unless made in the presence of counsel. (People v Cunningham, supra; People v Skinner, supra; People v Bartolomeo, supra.) But, in this case, we are not faced with a waiver of the defendant’s right to counsel. In fact, the police were told that he had come to speak with them on the advice of his attorney and the attorney confirmed this. Later, they properly ceased questioning as soon as the defendant indicated he wanted to speak with his attorney again.
In retrospect, one may argue that the attorney’s advice was poor, but it was precipitated, at least in part, by defendant’s own conduct which misled his attorney. As long as the police honored the defendant’s right to counsel, and determined that he was speaking with them on advice of counsel, the defendant was afforded all the protections encompassed by the constitutional right to counsel.
Accordingly, the orders of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jones, Wachtler, Fuchsberg and Meyer concur; Judge Gabrielli taking no part.
Orders affirmed.