OPINION OF THE COURT
 

 Wesley, J.
 

 Defendant was charged under a 22-count indictment for an array of criminal activities, including the intentional murders of four people, in Rochester, New York. According to the People’s proof at the Grand Jury, Joangel Toro and Johvanny Diaz were murdered in the City of Rochester during the early morning hours of August 6, 1995 while they stood next to each other at a telephone booth. Defendant and his cousin (who was allegedly hired to “kneecap” Diaz) armed themselves with .38 caliber and .45 caliber handguns, and sought out Diaz. Wearing stocking-style masks to disguise their identity, defendant and his cohort shot Diaz eight times, including three shots to the head. Toro was shot three times, including a shot to the head.
 

 The Grand Jury also heard testimony concerning the murder of Peter Holley, who was shot on September 22, 1995 in the
 
 *330
 
 City of Rochester. Following a report from defendant’s cousin that a bicycle and gold chain were stolen from him, defendant took a sawed-off shotgun and, along with his cousin, drove around the west side of Rochester looking for the thief. The cousin identified Holley, whereupon defendant loaded his shotgun, pulled up behind Holley’s vehicle and shot him in the neck and head.
 

 Lastly, there was testimony before the Grand Jury that on November 2, 1996, Juan Rodriguez-Matos was forced at gunpoint into defendant’s vehicle. Matos was driven to defendant’s home, handcuffed and placed in a chair. Defendant interrogated Matos about the whereabouts of a former girlfriend. When Matos failed to provide satisfactory answers, defendant ordered that Matos be placed in a bathroom. Later, Matos was taken out of the bathroom, led to the basement, blindfolded and executed with a .25 caliber pistol shot through the left side of the head by either defendant or his wife, at defendant’s command. Defendant then placed a plastic bag over Matos’ head and left him lying on the basement floor until he died several hours later. Defendant, his wife and brother wrapped Matos’ body in curtains and clothing, placed the body into a car and drove to a dead-end street where they dumped the body.
 
 [1]
 

 This appeal concerns counts 11 and 12 of the indictment, which charge defendant with murder in the first degree pursuant to Penal Law § 125.27 (1) (a) (xi). This section imposes criminal liability on anyone who:
 

 “intentionally caused the death of two or more additional persons within the state in separate criminal transactions within a period of twenty-four months when committed in a similar fashion or pursuant to a common scheme or plan.”
 

 The People charged defendant on the theory that he acted “in a similar fashion” when, within a 24-month period, he intentionally murdered. Matos, Diaz, Toro and Holley.
 

 County Court dismissed these counts, concluding that the evidence presented to the Grand Jury was insufficient to support a charge pursuant to this subsection. The court examined the legislative history of the statute and concluded that Penal Law § 125.27 (1) (a) (xi) “reflects an executive and legislative
 
 *331
 
 intent to deal with serial murders” (175 Misc 2d 192, 216). The court also noted that the statute draws a distinction between murders “committed in a similar fashion” and those committed “pursuant to a common scheme or plan” as this distinction was developed in
 
 People v Molineux
 
 (168 NY 264) and its progeny. Relying on our
 
 Molineux
 
 evidentiary jurisprudence, it concluded that “the context in which the statute was debated and passed by the Legislature, signed into law by the Governor and promoted by those two branches of government was aimed at protecting the public from the Son of Sam, Ted Bundy and Arthur Shawcross-type serial killers” (175 Misc 2d, at 217). The court rejected the People’s arguments that the murders were “committed in a similar fashion” and determined that “[t]here is nothing so unique, ritualistic, [or] signature-like about these homicides that would support the Grand Jury’s decision to indict the defendant under this statute” (175 Misc 2d, at 218).
 

 The Appellate Division affirmed (249 AD2d 894) although it did not embrace County Court’s reasoning. The Court noted that “[e]ven affording the phrase ‘in a similar fashion’ its plain meaning * * * the evidence before the Grand Jury was legally insufficient * * * Because the murders did not adequately resemble each other with respect to motive, method, and surrounding circumstances, they were not ‘committed in a similar fashion’ ”
 
 (id.,
 
 at 895). The Chief Judge of this Court granted leave to appeal.
 

 The People argue that the Appellate Division and the trial court erred in their interpretation of the phrase “committed in a similar fashion” and that both courts applied an incorrect standard in assessing whether a prima facie case was established at the Grand Jury. According to the People, employing a “common sense” definition of this phrase leads to only one conclusion: that the evidence before the Grand Jury was sufficient to establish that the murders in question were “committed in a similar fashion.”
 

 Defendant, on the other hand, contends that our jurisprudence requires that Penal Law § 125.27 (1) (a) (xi) be construed according to the evidentiary principles of
 
 Molineux.
 
 In urging us to adopt County Court’s reasoning, defendant argues that when words or phrases have a well-settled legal meaning in our jurisprudence, it is presumed that the Legislature understands that meaning when it adopts a statutory provision which includes that language
 
 (Matter of Moran Towing & Transp. Co. v State Tax Commn.,
 
 72 NY2d 166, 173; McKinney’s Cons Laws of NY, Book 1, Statutes § 233).
 

 
 *332
 
 We agree with the lower court determinations that the evidence presented to the Grand Jury was insufficient to establish that the killings at issue here were “committed in a similar fashion” pursuant to Penal Law § 125.27 (1) (a) (xi) and therefore affirm.
 

 It is clear that the Legislature and the Governor intended the phrase “committed in a similar fashion” to include serial killings
 
 (see,
 
 Governor’s Mem approving L 1995, ch 1, 1995 McKinney’s Session Laws of NY, at 2283; Bill Jacket, Assembly Codes Committee Mem approving L 1995, ch 1;
 
 id.,
 
 Atty Gen Mem regarding L 1995, ch 1;
 
 see also,
 
 Assembly Debate on Assembly Bill A4843, Mar. 6, 1995, at 126, 336, 405, 406, 427 [statements of Assembly Members Straniere, Murtaugh, Mc-Eneny and Tonko]). Contrary to defendant’s contention, however, this phrase does not have a well-settled legal meaning in our jurisprudence.
 

 In analyzing the phrase, County Court looked to our case law concerning the identity exception for the admission of uncharged crimes at trial, first articulated in
 
 People v Molineux (supra).
 
 This exception is used in limited circumstances, when the defendant employs some unique, unusual, or distinctive
 
 modus operandi
 
 in an uncharged crime that is relevant to proving his identity as the perpetrator of the crime charged
 
 (see, People v Beam,
 
 57 NY2d 241, 253;
 
 People v Condon,
 
 26 NY2d 139,144;
 
 People v Allweiss,
 
 48 NY2d 40, 47-48). Although County Court correctly held that the proof fell short of establishing that the crimes were “committed in a similar fashion,” we disagree with its conclusion that these cases establish a template for defining the phrase “committed in a similar fashion” under Penal Law § 125.27 (1) (a) (xi). The precise phrase is not used in our
 
 Molineux
 
 line of cases, and nothing in the history of the death penalty statute suggests that the Legislature intended to adopt either the rationale or the standards governing the identity evidentiary exception to define this classification of capital murder.
 
 [2]
 

 Both defendant and the People ask us to fashion a set of criteria to define the requirements of the statutory phrase at
 
 *333
 
 issue; they ask us to provide a calculus of “similarity” by which all future cases might be plotted. To do so, however, would ignore the relative nature and contextual considerations inherent in any analysis and application of the “similarity” element. For this reason, the typical process by which this Court fulfills its adjudicative responsibility in setting prospective, applied particularization does not lend itself to a more definite resolution of the nature of “similarity” beyond the determination of the facts presented in this case.
 

 Here, the murder victims were of different ethnic and racial backgrounds and ranged in age from 16 to 20. A .45 caliber handgun, a .38 caliber handgun, a .25 caliber handgun, and a sawed-off shotgun were the varied weapons used to commit these murders. The motives for each shooting differed, as did the wounds inflicted by defendant upon his victims. Moreover, the locations of these multiple killings were different: two occurred on a public sidewalk during the same incident, one occurred as defendant sat in a car on a public street and one transpired in defendant’s basement while the victim was handcuffed and blindfolded. The common denominator of these crimes is that four young men were murdered by firearms. By any standard, the evidence before the Grand Jury was legally insufficient to establish the “committed in a similar fashion” element of the statute.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Levine, Ciparick and Rosenblatt concur.
 

 Order affirmed.
 

 [1]
 

 . Defendant was convicted of first degree murder for the murder of Matos and was sentenced to death. He has filed a notice of appeal to this Court.
 

 [2]
 

 . Moreover, although County Court determined that there was “nothing so unique, ritualistic, [or] signature-like” about these homicides, it misinterpreted our
 
 Molineux
 
 jurisprudence in this regard. This Court has articulated the identity exception standard as “unique,” “unusual”
 
 (People v Condon,
 
 supra) and “distinctive”
 
 (People v Beam, supra).
 
 However, in
 
 Beam
 
 we explicitly stated that in order to establish a
 
 modus operandi, “it is not necessary that the pattern be ritualistic
 
 for it to be considered unique”
 
 (id.,
 
 at 253 [emphasis added]).