OPINION OF THE COURT
Robert Charles Kohm, J.
The People seek an order with respect to the introduction of *82 certain Molineux evidence and defendant cross-moves for suppression of physical evidence.
The People seek to introduce evidence of other crimes, to wit, eyewitness identification and certain items recovered from the defendant’s person, auto and home at about the time of defendant’s arrest.
The court, prior to the admission of such evidence, was informed that such evidence had not been ruled upon by the courts of Kings and Richmond Counties. The court, in order to safeguard the defendant’s constitutional rights, ordered that a hearing be granted as to admissibility of eyewitness testimony and property seized from the defendant.
As a case of first impression, the court chooses to admit such evidence only for this trial and not for any other purpose, allowing the other county courts to rule upon the admissibility of evidence after a hearing. One of the factors the court based its decision on is the fact that the burden of proof on a Molineux-Ventimiglia application is lower than that of a suppression hearing.
A Ventimiglia-Molineux-Mapp hearing was held on December 2, 1999 and concluded on December 7, 1999. Detective Sean Kennedy testified for the People and the court found his testimony to be credible. At that time, the court granted the Molineux application and denied the suppression of physical evidence, but in its discretion precluded the introduction of certain physical evidence since it was not part of the modus operandi.
This decision is amplified in the following memorandum.
I. THE QUEENS INDICTMENT
The defendant is preséntly charged with entering the house of a Queens resident, Dorothy McCloskey, and robbing her at knifepoint of money and jewelry.
The facts indicate that on February 10, 1999 the complainant returned from pushing her infant son in a stroller. She entered her house and left the infant in the living room to check on possible messages. When she returned, she observed a man pointing a gun at her. She picked up her child and tried to escape but was pushed to the ground. The man dropped the gun and produced a knife, placing it near the infant’s throat. He stated that “he was not here to hurt anyone” but only to rob, demanding money and jewelry. He then dragged her by the hair going into the bedroom where the man removed a cell *83 phone and jewelry. Mrs. McCloskey and her son were placed in a bathroom. The perpetrator then left.
The complainant described the stranger as a white male, 30 to 40, 5 feet 9 inches or 5 feet 10 inches, 200 pounds, grey hair and brown eyes. He was wearing a black leather jacket and .used a tan-colored bandana. The knife was a black pocket knife.
On March 12, 1999 the defendant, Robert Manino, was arrested in Staten Island for robberies allegedly committed in that county. At that time he was wearing, among other things, a black leather jacket which was vouchered. The basis for defendant’s arrest was set forth in Judge Leonard P. Rienzi’s June 8, 1999 Staten Island ruling which stated “motion for a Dunaway hearing is denied as defendant has been identified in photo arrays several hours prior to his arrest and, therefore, there was probable cause to take him into custody.”
Earlier, on March 12, 1999, the complainant in this case, Mrs. McCloskey, accompanied Detective Alquimides Arroyo, Queens Robbery Squad, to the 122nd Precinct in Staten Island to view a lineup and positively identified the defendant in position number six as the individual who entered her home and robbed her. This lineup was held to be constitutionally valid by the Honorable Daniel Lewis in a Wade hearing conducted in the Queens County Supreme Court on August 18, 1999 and, thus, there was no basis to suppress same.
The People now seek to offer evidence of five similar home-invasion robberies on:
(1) September 22, 1998 at Genesse Avenue, Staten Island, New York;
(2) October 2, 1998 at Holdridge Avenue, State Island, New York;
(3) January 4, 1999 at 76th Street, Brooklyn, New York;
(4) January 25, 1999 at Main Street, Staten Island, New York;
(5) February 9, 1999 at Bennett Avenue, Staten Island, New York.
Defendant opposes such application arguing that these similar crimes would clearly prejudice his case.
The prosecution points out that where the evidence of an extraneous crime tends to identify the person who committed it as the same person who is charged with the crime in the indictment, it is admissible pursuant to People v Molineux (168 NY 264).
Generally, the evidence of similar uncharged crimes is inadmissible since a jury may convict a defendant because he *84 has a propensity to commit such acts (see, People v Alvino, 71 NY2d 233, 241). However, evidence of an uncharged crime may be admissible if it is probative of a material element of the crime charged (People v Ventimiglia, 52 NY2d 350, 359). There is no litmus paper test for determining when the probative value of the evidence outweighs its potential for prejudice. The basic situations in which evidence of prior crimes is admissible was set forth originally in People v Molineux (supra, at 293) and included (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common plan dealing with the commission of two or more crimes so related to each other that the proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial. In the instant case, the defendant seeks to utilize the last category — identity. Normally the courts will permit the application of the identity exception in those cases in which the defendant’s identity is not conclusively established (see, People v Beam, 57 NY2d 241, 251; People v Condon, 26 NY2d 139, 142). Since the defendant’s identity was not adjudicated or conceded, identity is still an issue which must be established. Further, such evidence of an uncharged crime must be shown by the People by clear and convincing evidence to share the unique modus operandi of the crimes charged and defendant’s identity as the perpetrator of the crime (see, People v Robinson, 68 NY2d 541, 550).
As for the modus operandi, past crimes are not enough; the People must establish that “the other • acts and the crime charged bear similarities too great to be explained by coincidence” (Prince, Richardson on Evidence § 4-514, at 190 [Farrell 11th ed]). A similar modus operandi is not enough; there must be sufficient uniqueness to identify the accused as the perpetrator of the crime charged (People v Robinson, supra, at 549).
The present case originated in the fall of 1998 when Detective Sean Kennedy, Staten Island Robbery Squad, was investigating a series of robberies with a common pattern, designated as Robbery Pattern No. 16 in Staten Island and Citywide Pattern No. 6 of 1998. There were six robberies involved in this series.
The first robbery involved a residence at Genessee Avenue, Staten Island. The complainant, Ms. DeFonte, was home with her young daughter, when she heard the child scream, and saw a white male holding a knife against the young girl’s neck. The man pulled the woman by the hair, told her to be quiet *85 and she would not be hurt. He demanded money and jewelry including her wedding ring, ordering the woman to get on the floor. After the theft, he brought mother and daughter to the basement, pulling wire from the wall. When the man went upstairs to search for valuables again, Ms. DeFonte escaped the house with her daughter.
Ms. DeFonte described the perpetrator as a white male, 30 to 35 years old, approximately 5 feet 9 inches, blondish salt and pepper hair, and 190 pounds. He wore a turquoise and white bandana, blue jeans and a flannel-type tan-beige shirt.
The second robbery occurred on October 2, 1998 at a residence on Holdridge Avenue, Staten Island. The complainant, Mrs. Tarsillo, had just returned home from shopping with her infant daughter. Bringing her packages inside the house, she noticed a strange grey car almost parked in her neighbor’s driveway. She locked her door and then saw a stranger standing in her dining room holding a knife. She tried to flee but was thrown to the ground and the knife placed against her neck. He told her he was not here to hurt her but wanted her cash and jewelry, as well as her wedding ring. She was brought to the second floor and he searched for valuables. He then dragged her by the hair and took her to the basement. She pleaded to be upstairs with her baby and the man agreed. He fled the house, driving away in a grey 1980 Monte Carlo or Cutlass-type car.
Mrs. Tarsillo described the perpetrator as a white male in his 30’s, about 5 feet 9 inches and 190 pounds, with light brown salt and pepper hair. He had some sort of grey cloth, possibly a bandana, about his face. The weapon was a grey knife.
A third house invasion occurred on January 4, 1999. This time it was on 76th Street, Brooklyn. The complainant, Mrs. Carlino, had just returned from shopping and entered her house. A few minutes later, she heard a knock at her front door and opened it. A man asked her if she called a plumber. She replied “no” and the stranger forced his way into the house, displaying a black-handled knife. He told her he was not going to hurt her and just wanted her jewelry and money. The victim had a dog and the man warned her to keep it downstairs. After taking numerous items of jewelry, he took her downstairs to hide her in the basement, but she fled the house.
Mrs. Carlino described the stranger as 35 years old, 5 feet 8 inches to 5 feet 9 inches, 190 to 200 pounds, premature grey hair and wearing a black leather jacket.
A fourth robbery took place on January 25, 1999 at Main Street, Staten Island. The victim, Mrs. Messina, was returning *86 home from shopping and noticed a black GMC Jimmy or Blazer vehicle in front of her house. A white male was driving. She then took her packages inside her house. A few minutes later, the doorbell rang and she opened the door. It was the same man in the vehicle and he asked “is Joe here?” She answered “No” and the stranger forced his way into the house, displaying a silver type of knife. He stated that he was not going to hurt her and wanted all her jewelry and money. He took her wedding ring and then dragged her upstairs by the hair. The stranger then searched several rooms, looking for jewelry.
He once again grabbed her by the hair and told her “I need to hide you — where’s your basement?” The victim took him there and he told her to “lay on the floor.” He tied her up with the telephone cord from the phone. He returned upstairs and left.
Ms. Messina described the perpetrator as a white male, 35 to 40, 5 feet 10 inches, stocky build, about 200 pounds, grey hair, wearing a black leather jacket and dungarees. He wore a black and white bandana.
A fifth house-entering robbery took place on February 9, 1999 at Bennett Avenue, Staten Island, New York. The victim was Mrs. Russo who had just returned from shopping with her mother who lived in an apartment on the side of her house. Each woman took her packages into her residence. A short time later a UPS driver delivered a package of dishes from Macy’s and she signed for it.
A few minutes later the doorbell rang a second time and a man, displaying a small silver shield, was at the door. He stated he was a detective investigating drugs coming into the area through UPS shipments and asked if he could look at the package she just received. She agreed and let him in to examine the delivery. Once inside, the stranger pulled out a small black gun and stated that he was there to rob her. He told her he was not going to hurt her but wanted her money and jewelry. She was pulled by the hair upstairs to her bedroom and her children’s room, where he found cash and jewelry. He also displayed a knife. He took her down to the basement, cut a cord from a television set and tied her up with it. He then resumed searching the house and finally left.
The complainant described the man as 5 feet 9 inches, 190 to 200 pounds, grey hair, brown eyes, stocky build, wearing blue jeans and a black jacket. Also, a red and white bandana was used.
Since these five crimes were similar in nature, photo identifications were made on the part of complainants which *87 led to defendant’s arrest. Thereafter all five complainants attended lineups at the 122nd Precinct on Staten Island. Each complainant viewed six suspects. Number six was the defendant. After viewing the lineup, each complainant made a positive identification of the defendant as the man who robbed her.
Having touched on the prior matters, the court now turns to the Queens indictment. As indicated earlier, on February 10, 1999, Mrs. McCloskey was walking her infant son in his baby carriage. She returned home and pushed the carriage inside, going into another room. When she returned to her son, she saw a man pointing a gun at her. He then proceeded to search her house, robbed her and fled.
With this background, the court turns to the two issues that must be resolved, to wit:
(1) Did the Staten Island robberies and the Brooklyn robbery share the unique modus operandi of the Queens robbery (People v Molineux, 168 NY 264, supra)?
(2) Was defendant’s identity as the perpetrator of the uncharged crime established (People v Robinson, 68 NY2d 541, supra)?
As regards the first point, the complainant’s case involved a white male who entered her house in some fashion, threatened her with a gun and knife, and told her that he was not there to hurt her, but wanted her money. Once inside, he pulled her by the hair, searched the bedrooms and took cash and items. Then he told her he wanted to “hide” her, placed her in a room and fled.
Analyzing the five other cases, all involved a home entry, either by force or subterfuge, followed by a fixed pattern of advising the victim that he was not there to harm but only to rob cash or jewelry. In four of the five cases, the complainants were dragged by the hair. All but Dorothy McCloskey were brought upstairs while the perpetrator searched the bedroom. Then the victims were taken downstairs and told they would have to be hidden. The majority were tied up in the basement with appliance cords or plastic ties. Thus, the actual patterns of the robberies included similar acts, repeated statements and a step-by-step criminal routine. A knife and bandana were used in all cases and a black leather jacket in most of them. Each victim identified the knife recovered from defendant’s house as the knife used in the robberies. These robberies could be called unique (People v Condon, 26 NY2d 139, supra) in that they exhibited so many common similarities as to create a *88 distinctive modus operandi (see, People v Mateo, 93 NY2d 327, 333) which is applicable to the Queens case.
As for identification, the hearing evidence establishes that all of the victims gave a prompt and accurate description to the police (see, People v Beam, 57 NY2d 241, 251, supra) which was followed up by photo identification and lineup verification in the Richmond County station house. Under these facts, the People have satisfied the second requirement of defendant’s identity as the perpetrator of the Staten Island and Kings County robberies.
II. THE MAPP APPLICATION
The defendant moves to suppress a black leather jacket and a St. Jude medal. Both of these items were on defendant’s person at the time of his arrest.
Since the defendant was arrested on probable cause (see, People v Manio, Sup Ct, Richmond County, June 8, 1999, Rienzi, J., index No. 83/99), the confiscation of the items was justified as an incident of a lawful arrest, particularly so since there was a need to protect such evidence from destruction (see, People v Gokey, 60 NY2d 309, 312; People v Smith, 59 NY2d 454, 458; People v Belton, 55 NY2d 49, 52-53; People v Manigault, 247 AD2d 255, 256). Thus, the application to suppress these items of personal property is denied. However, the court precludes the admission of the St. Jude medal since it was not identified as being worn during the majority of the alleged robberies.
The People’s application to introduce the evidence of the five prior robberies is, therefore, granted pursuant to People v Ventimiglia (52 NY2d 350, supra) and People v Molineux (supra), and defendant’s application to suppress personal property is denied.