[974 NYS2d 77]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DARRYL LITTLEJOHN, Appellant.

Second Department, October 30, 2013

68

## APPEARANCES OF COUNSEL

*Lynn W.L. Fahey*, New York City (*William Kastin* of counsel), for appellant.

*Charles J. Hynes*, *District Attorney*, Brooklyn (*Leonard Joblove* and *Victor Barall* of counsel), for respondent.

## OPINION OF THE COURT

Mastro, J.P.

On this appeal by the defendant from a judgment convicting him of murder in the first degree, we principally are called upon to determine whether the introduction at trial of certain evidence of other crimes committed by the defendant, for the purpose of proving the defendant's identity as the killer, constituted reversible error. We conclude that while some of the challenged evidence was improperly admitted, the error was harmless and did not deprive the defendant of a fair trial.

The Murder of Imette St. Guillen

At approximately 4:00 a.m. on February 25, 2006, 24-year-old graduate student Imette St. Guillen was the lone remaining patron at the Falls, a bar in Manhattan that was in the process of closing for the night. She was last seen alive after she finished her drink at the bar, and was escorted out of the establishment by the defendant, a bouncer employed at the Falls, and another employee who went directly home. According to the defendant's own subsequent statements to the police, in order to facilitate his job as a bouncer, he falsely told people at the Falls that he was a federal marshal. The defendant admitted that shortly

before he escorted the intoxicated St. Guillen out of the establishment, he had untruthfully informed her that he was a United States marshal.

At approximately 8:30 p.m. on that same date, St. Guillen's lifeless body was discovered in a vacant, overgrown lot in a desolate area at the intersection of Fountain Avenue and Seaview Avenue, near the Belt Parkway in Brooklyn. St. Guillen's body was wrapped in a quilt which had been taped closed at both ends. A sock had been stuffed in her mouth while she was still alive, and packing tape had been wrapped around her head from her eyebrows to her chin. Her wrists had been bound together behind her back with three plastic zip ties, and her feet had been bound together with what appeared to be a dark-colored shoelace. An automobile snow brush that was lying on the ground at the foot of the quilt also was recovered from the scene. The cause of death was determined to be asphyxia by compression of the neck and occlusion of the mouth and nose. The injuries on the body indicated that St. Guillen had resisted her attacker, and tears in the area of her vagina and anus were found to be consistent with a sexual assault. Medical experts estimated that St. Guillen was killed between one and three hours after she consumed her last alcoholic beverage on February 25, 2006.

The evidence at trial further revealed that the defendant's DNA was found on one of the zip ties used to bind St. Guillen's wrists, as well as on the automobile snow brush found next to her body. DNA from the defendant's mother and from the defendant's brother was found on the quilt in which St. Guillen's body had been wrapped. Carpet fibers and two different types of animal hair found on the quilt and on the tape that had been wrapped around St. Guillen's head were consistent with samples taken from the defendant's basement apartment in Jamaica, Queens, and from a van that he used. Moreover, approximately one hour before St. Guillen's body was discovered, a witness observed a van, which generally matched the characteristics of the van used by the defendant, at the remote location where the body was found. The same witness observed a man using a cellular phone while seated inside the vehicle. An investigation of the defendant's cellular phone calling records for that time period revealed that the call activity was consistent with the defendant's phone having traveled from the vicinity of his residence in Queens to the vicinity of the body's location in Brooklyn, and then returning to the vicinity of the defendant's residence.

The Evidence of Other Crimes

In addition to the foregoing evidence and other proof, including inconsistent statements made by the defendant during the investigation and evidence that he attempted to set up a false alibi for the day of the killing, the prosecution sought to introduce evidence of other crimes committed by the defendant on its case-in-chief. The evidence of other crimes, consisting of an uncharged sexual assault and a kidnapping, was offered to help establish the defendant's identity as the killer of St. Guillen pursuant to the modus operandi exception to the general prohibition against evidence of other crimes set forth in *People v Molineux* (168 NY 264 [1901]). The trial court granted the prosecution's application (23 Misc 3d 1127[A], 2009 NY Slip Op 50958[U] [2009]).

In the first such incident, which occurred on October 16, 2005, the assailant, while driving a vehicle and dressed in a uniform suggesting that he was a member of law enforcement, accosted a young, unaccompanied woman (hereinafter M.S.) at approximately 5:05 a.m. as she was walking in the vicinity of Queens Boulevard near the 67th Avenue subway stop. The assailant repeatedly asked M.S. if she had identification and then exited the vehicle and approached her. M.S., believing that the assailant was an immigration officer, stopped to speak with him. The assailant grabbed her from behind, handcuffed her wrists behind her back, pushed her into the back seat of the vehicle, and covered her with a black jacket. He drove for approximately 10 minutes to another location in Queens and then escorted her into what she believed was a basement apartment. After removing some of her clothes, he taped a knit cap around her head so that she remained unable to see, wrapping the tape around "[m]any times." The assailant handcuffed M.S. to a bed and then orally sodomized her and sexually assaulted her "in more than one way." M.S. did not resist her attacker because she was afraid. The assailant subsequently cleaned her genital area with what appeared to be alcohol and forced her to rinse her mouth with some type of bitter mouthwash. He then gave M.S. a T-shirt and a pair of shorts to wear. He removed the knit cap and tape from her head but kept her head covered and drove her to an area near an address that she provided, where he let her out of the vehicle. Although M.S. was unable to identify the defendant as her assailant from a lineup that she viewed several months after the incident, a circumstance that she attributed to the fact that she was blindfolded during virtually the entire incident,

the defendant's appearance was largely consistent with the general description she provided of her attacker. Moreover, a forensic analysis of the T-shirt she was given to wear revealed that it contained DNA from the defendant's mother.

In the second incident, which occurred in the vicinity of the Van Wyck Expressway near Jamaica, Queens, at approximately 3:30 p.m. on October 19, 2005, a college student (hereinafter S.W.) was walking home from school alone when a man whom she identified as the defendant approached her. The defendant "looked like an officer of the law," as he was wearing dark blue police-issue pants, a blue jacket, combat boots, a belt equipped with handcuffs, a radio, and a gun, and a dark blue shirt and blue cap, both of which bore the words "Fugitive Agency" in yellow lettering. The defendant asked for her identification and, after she gave it to him, he looked at it briefly and then handcuffed her wrists together behind her back. When S.W. asked if she could call someone, the defendant responded that she could not, took her phone, and pushed her into a dark blue van that was parked nearby. Once inside, S.W. realized that the defendant was not a police officer. As the defendant drove, S.W. pushed herself up from the floor behind the passenger seat and managed to open the van door and call for help. The defendant then stopped the van, punched S.W. in the head two or three times, forced her to lie back down on the floor, and covered her with a jacket. The defendant resumed driving, but after a brief period, S.W. again succeeded in opening the van door and then pushed herself out of the moving vehicle and onto a street where children were playing. The van briefly slowed, but then drove off. Police subsequently responded to the scene and removed the handcuffs from S.W. The defendant's DNA was found on the handcuffs. A few months later, in March 2006, S.W. was watching a news report on the television and saw the same van that had been used in her abduction. She contacted the police, who brought her to a van at the defendant's residence. A search warrant was issued for the van, and S.W.'s DNA was found on a seat cushion recovered from the vehicle. The defendant's DNA also was found on various items removed from the van.

After evidence of each of the foregoing incidents was presented, the trial court provided the jury with a limiting instruction, noting that the evidence could be considered solely on the question of proving the identity of the perpetrator in this case, and not for the purpose of proving the defendant's criminal propensity or for any other purpose. The jury convicted the defendant of murder in the first degree.

Analysis

 At the outset, we reject the defendant's challenges to the admission of the cellular phone tracking evidence adduced at his trial. Contrary to the defendant's contention, the Supreme Court properly denied his request for a *Frye* hearing (*see Frye v United States*, 293 F 1013 [1923]) with regard to this evidence, since the expert testimony proffered by the prosecution did not concern a novel scientific theory, technique, or procedure, but instead involved deductions made from cell phone site data in a manner consistent with a generally accepted scientific process (*see generally Parker v Mobil Oil Corp.*, 7 NY3d 434, 446-447 [2006]; *Ratner v McNeil-PPC, Inc.*, 91 AD3d 63, 74 [2011]; *Alexander v Dunlop Tire Corp.*, 81 AD3d 1134, 1135 [2011]; *People v Tetrault*, 53 AD3d 558, 558-559 [2008]; *People v Abdul*, 244 AD2d 237 [1997], *cert denied* 525 US 880 [1998]), upon which courts have previously relied (*see e.g. In re Application of U.S. for an Order for Prospective Cell Site Location Info. on a Certain Cellular Tel.*, 460 F Supp 2d 448, 450-452 [2006]; *People v Arafet*, 13 NY3d 460, 463-464 [2009]; *People v Hall*, 14 Misc 3d 245, 249-250 [2006]). Furthermore, the Supreme Court providently exercised its discretion in determining that the proffered expert, a T-Mobile radio frequency engineer with 10 years of experience in the field, was qualified to provide expert testimony in this regard (*see Matott v Ward*, 48 NY2d 455, 459 [1979]; *People v Colon*, 61 AD3d 772, 773 [2009]; *People v Jean-Laurent*, 51 AD3d 818 [2008]; *People v Menendez*, 50 AD3d 1061, 1061-1062 [2008]; *People v Rivera*, 236 AD2d 428, 429 [1997]).

The defendant further contends that the trial court erroneously admitted the evidence of other crimes. "Evidence of uncharged crimes is inadmissible where its only purpose is to show bad character or propensity towards crime" (*People v Arafet*, 13 NY3d at 464-465; *see People v Rojas*, 97 NY2d 32 [2001]; *People v Vargas* 88 NY2d 856 [1996]; *People v Molineux*, 168 NY 264 [1901]; *People v Wilkinson*, 71 AD3d 249 [2010]). "On the other hand, evidence relevant to prove some fact in the case, other than the defendant's criminal propensity, is not rendered inadmissible simply because it may also reveal that the defendant has committed other crimes" (*People v Allweiss*, 48 NY2d 40, 46-47 [1979]). In *People v Cass* (18 NY3d 553, 560 [2012] [footnote omitted]), the Court of Appeals set forth the analytical approach for determining *Molineux* issues as follows:

> "To determine whether *Molineux* evidence may be admitted in a particular case, the trial court must

engage in the following two-part inquiry (*see [People v] Alvino*, 71 NY2d [233,] 242; *Allweiss*, 48 NY2d at 46-47): first, the proponent of the evidence must identify some material issue, other than the defendant's criminal propensity, to which the evidence is directly relevant (*see Alvino*, 71 NY2d at 242); once the requisite showing is made, the trial court must weigh the evidence's probative value against its potential for undue prejudice to the defendant (*see People v Hudy*, 73 NY2d 40, 55 [1988], *abrogated on other grounds by Carmell v Texas*, 529 US 513 [2000]). If the evidence has substantial probative value and is directly relevant to the purpose—other than to show criminal propensity—for which it is offered, the probative value of the evidence outweighs the danger of prejudice and the court may admit the evidence (*see Allweiss*, 48 NY2d at 46-47; *People v McKinney*, 24 NY2d 180, 184 [1969])."

Generally, evidence of other crimes may be admitted to prove the specific crime charged when it is relevant to show (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the defendant (*see People v Arafet*, 13 NY3d at 465; *People v Alvino*, 71 NY2d at 241-242), although these categories are not exhaustive (*see People v Cass*, 18 NY3d at 560).

In this case, the evidence of other crimes was offered to establish the defendant's identity as St. Guillen's killer. Such evidence may be admitted if, as a threshold matter, the defendant's identity is in issue and is not "conclusively established" by other evidence (*People v Allweiss*, 48 NY2d at 47; *see People v Agina*, 18 NY3d 600, 605 [2012]), and it is demonstrated by clear and convincing evidence that the defendant is the same person who committed the other crimes (*see People v Robinson*, 68 NY2d 541, 548-550 [1986]; *People v Delarosa*, 218 AD2d 667, 668-669 [1995]). Here, it cannot be said that the defendant's identity as the killer was conclusively established so as to warrant the preclusion of other crimes evidence to prove identity. Indeed, while the evidence that the defendant was the person who killed St. Guillen was compelling, it was also entirely circumstantial. Moreover, the defendant vigorously contested the identification issue and presented as a defense the assertion that his employer at the Falls had been the actual killer. Thus, the identity of the murderer was a disputed issue in the case, and any admissible evidence tending to establish identification

was relevant (*see People v Allweiss*, 48 NY2d at 48-49). Likewise, the defendant's identity as the person who committed the other crimes against M.S. and S.W. was established by clear and convincing evidence (*see e.g. People v Delarosa*, 218 AD2d at 668-669). The defendant fit the description of the assailant provided by M.S., and his mother's DNA was present on the shirt that the assailant gave M.S. to wear. Similarly, the defendant's DNA was found on the handcuffs that were placed on S.W., S.W.'s DNA was discovered on a seat cushion in the van used by the defendant, and S.W. identified the defendant as her assailant in court. In fact, the defendant was convicted of kidnapping and other offenses in connection with the incident involving S.W. (*see People v Littlejohn*, 92 AD3d 898 [2012]).

Of course, the identity exception to the *Molineux* rule "is used in limited circumstances, when the defendant employs some unique, unusual, or distinctive *modus operandi* in an uncharged crime that is relevant to proving his identity as the perpetrator of the crime charged" (*People v Mateo*, 93 NY2d 327, 332 [1999]). "[E]vidence of a similar crime may be admissible to identify the defendant where 'the similarities [are] unusual enough to compel the inference that the defendant committed both'" (*People v Agina*, 18 NY3d at 603, quoting *People v Beam,* 57 NY2d 241, 251 [1982]). The defendant argues that the evidence of other crimes proffered in this case did not feature a sufficiently distinctive modus operandi in common with the instant case so as to render it admissible. With regard to the evidence of the attack on M.S., we disagree.

As the People correctly contend, the evidence reveals that both the offense committed against M.S. and the charged crime in this case featured attacks on young, unaccompanied women, the defendant held himself out as a member of law enforcement in both encounters in an apparent attempt to facilitate commission of the crimes, the hands of both victims were bound behind their backs, and both victims were transported in a vehicle. Additionally, both victims were attacked during the early hours of the morning, there was evidence of sexual assault of the victims in multiple ways in both incidents, and significantly, both had large amounts of tape wrapped around their heads and over their faces. We find that these characteristics, common to both incidents, constitute a sufficiently distinctive modus operandi to render evidence of the attack on M.S. highly relevant to the issue of the identity of the perpetrator of the charged crime (*see People v Arafet*, 13 NY3d at 465-466; *People v Beam*, 57 NY2d at

252-253; *People v Allweiss*, 48 NY2d at 45-48; *People v Alston*, 62 AD3d 807, 808 [2009]; *People v Gousse*, 57 AD3d 800 [2008]; *People v Balazs*, 258 AD2d 658, 659 [1999]). While the defendant accurately observes that there are some factual differences between the attack on M.S. and the charged crime in the instant case, the identity exception to the *Molineux* rule does not require that the crimes be committed in an identical manner, and we are satisfied that the common features in both incidents, when considered in their totality (*see People v Beam*, 57 NY2d at 253), adequately established a "distinctive repetitive pattern" (*People v Allweiss*, 48 NY2d at 48; *see People v Arafet*, 13 NY3d at 466), making the evidence of the crime against M.S. highly probative of the killer's identity in this case.

Once the legal issue of relevance is determined, the inquiry turns to whether the trial court properly exercised its discretion in weighing the probative value and the need for the evidence of the M.S. incident against the potential for undue prejudice to the defendant (*see People v Cass*, 18 NY3d at 560 n 3; *People v Alvino*, 71 NY2d at 242). Given the circumstantial nature of the evidence tying the defendant to the murder, and the strong relevance of the M.S. incident to the issue of identification in this case, the trial court did not improvidently exercise its discretion in concluding that the evidence of the M.S. incident should be admitted because its probative value outweighed its potential for prejudice. Indeed, the prejudice to the defendant was limited by the fact that the testimony of M.S. did not dwell on the details of the sexual attack, and by the court's repeated limiting instruction that the evidence could only be considered on the issue of identity (*see People v Beam*, 57 NY2d at 250; *People v Allweiss*, 48 NY2d at 49).

■ The evidence of other crimes regarding S.W., however, presents a closer question on the issue of relevance, and we reach a different result with respect to it. To be sure, there are some strong similarities between the S.W. incident and the instant crime, including the status of each victim as a young, unaccompanied female, the defendant's misrepresentation that he was a member of law enforcement, the binding of each victim's hands behind her body, and evidence of the transportation of each victim in a van. Nevertheless, several key components of the instant offense, especially the wrapping of tape around the head and face of the victim and the commission of a sexual assault against her—circumstances that were present in the attack on M.S. and in the instant crime—did not occur dur-

ing the S.W. incident. While it may well be, as the People argue, that the absence of these additional factors was the fortuitous result of S.W.'s dramatic escape from the defendant, the fact remains that the S.W. incident does not sufficiently comport with the distinctive repetitive pattern found in the M.S. incident and in the present case so as to support its admission into evidence at the defendant's trial, and the trial court should have excluded it. However, we also find that the error was harmless. Indeed, given the previously referenced compelling circumstantial evidence of the defendant's commission of the murder of St. Guillen, and all of the other evidence in the case, the proof of the defendant's guilt may fairly be characterized as overwhelming, and there is no significant probability that the verdict would have been different if the court had excluded the evidence of the S.W. incident (*see e.g. People v Gillyard*, 13 NY3d 351, 356 [2009]; *People v Arafet*, 13 NY3d at 467-468). Furthermore, the admission of the evidence of the S.W. incident did not deprive the defendant of a fair trial.

In accordance with the foregoing, the judgment is affirmed.

HALL, LOTT and SGROI, JJ., concur.

Ordered that the judgment is affirmed.