OPINION OF THE COURT
Lewis Bart Stone, J.
On December 2, 2005, defendant Alexander Hall was indicted for one count of murder in the second degree (Penal Law § 125.25 [2]), four counts of assault in the first degree (Penal Law § 120.10 [3], [4]), and one count of criminal possession of a weapon in the second degree (Penal Law § 265.03 [2]), allegedly-committed on October 12, 2005. Hall now seeks to suppress records obtained on November 4, 2005 by the District Attorney’s office through a grand jury subpoena issued by the Honorable Michael Ambrecht, on the ground that such subpoena was issued without probable cause and in violation of Hall’s constitutional rights and also seeks to suppress identification evidence obtained subsequent to the issuance of the subpoena.
The evidence sought to be suppressed consists of records relating to Hall’s cellular telephone (the cel) obtained by the People from T-Mobile Cellular, the carrier for the cel. At the hearing held on June 26, 2006, the People called three witnesses: Sue Johnson, custodian of records for T-Mobile, Police , Detective Kevin Rivera of the 34th Precinct Detective Squad, and Assistant District Attorney A1 Peterson of the New York County District Attorney’s office. I find all such witnesses credible. The defense called no witnesses. After the evidentiary hearing, the court reviewed the written memoranda of law submitted by the parties and thereafter heard oral arguments.
Findings of Fact
On October 12, 2005, at approximately 4:11 a.m., outside of Club Viva located at 4168 Broadway, in Manhattan, three people *247 were shot, one of whom, Tabitha Perez, was killed. The investigation conducted by detectives of the New York City Police Department (NYPD) led to Hall and three of his friends, Sabin Abad, Christopher Ulanga and Javier Gonzalez, all of whom had earlier been ejected from the club and had been involved in an altercation with the club’s bouncers. Following the altercation, the four left in two separate vehicles, which had been parked in the adjacent parking garage. Shortly thereafter, the People contend, Hall returned in one of the vehicles and shot and killed Tabitha Perez and wounded the other two victims.
Rivera, an NYPD detective, was assigned to investigate the case. An attendant from the parking garage provided Rivera with the license plate number of one of the vehicles allegedly used by one of the persons fleeing the altercation. The vehicle matching such plate number was a blue Acura, registered to Ulanga’s grandfather. Ulanga was interviewed at the 34th Precinct on October 12, 2005 and he told Rivera that he was at the club with a friend named Mark, and that after they were there for a while he observed some type of dispute and thereafter left in the Acura with his friend Jay and went home. Ulanga disclosed his cell phone number to Rivera.
Following this interview, the People subpoenaed Ulanga’s cell phone incoming/outgoing call records in order to identify Mark, Jay, or other people Ulanga was in contact with that night as possible witnesses or suspects. After receiving the records of calls from Ulanga’s cell phone, the People then subpoenaed subscriber information for the phone numbers that Ulanga’s phone had made or received around the time of the shooting and the hours immediately following. This investigation led to cell phones belonging to Hall, Gonzalez, and Abad, each of whom were subsequently interviewed.
Gonzalez, who was interviewed by Rivera on October 23, 2005, stated that on the evening in question he was at the club with Abad, Ulanga and Hall, and was involved in the altercation and that afterwards he drove to the Bronx and dropped off Abad.
Abad, who was interviewed by Rivera on October 25, 2005, stated that he was in the club with Gonzalez, Ulanga and Hall that evening and he was escorted out when he tried to light a cigarette inside the club and that during the dispute outside the club he was injured on the head, and then drove to the Bronx with Gonzalez.
Hall, in the presence of counsel, was interviewed by Rivera on October 28, 2005, at which time he stated that he was at the *248 club with Ulanga, Abad, and Gonzalez, and stated that during the dispute he grabbed Abad and told him “don’t worry about it, we will see him later.” Hall claimed that after the dispute, the four went to the garage to retrieve their vehicles and all four went directly to the vicinity of Hall’s apartment on West 96th Street. Gonzalez stayed and slept on the couch and Ulanga and Abad left. Hall stated that he was not in the vicinity of the club at the time of the shooting.
Following the Hall interview, and recognizing the conflict between the stories of the four as to where each was at the relevant times, the People obtained a court order for cell site records for each of the four cell phone numbers, to enable them to determine the general location of where calls were made from the cell telephones of each of the four men between the time the four left the club and the time of the shooting. T-Mobile’s system automatically records the identity of the antenna tower to which a particular cell phone was connected at the beginning and end of each call made or received by that phone.
Based on the affidavit of an assistant district attorney attesting to the facts gleaned in the investigation, Honorable Michael Ambrecht, sitting as the grand jury judge, issued subpoenas to T-Mobile for such cell site information for the cell phones of the four suspects (including the cel), between October 10 and October 13, 2005. T-Mobile, which had recorded such information in the ordinary course of its business and retained such records for its own business purposes, complied, providing subscriber information for the cel showing Hall’s account number, name, address, Social Security number, date of birth, and home telephone number and call detail records from October 10 to October 13, 2005, the dates requested in the subpoena. These records show the start time, end time, and duration of each call made or answered by the cel for the specified dates as well as cell tower records identifying which T-Mobile cell tower received the signal from the cel at the beginning and end of each call, thus, identifying the approximate location of the cel when completed calls to or from it were begun and ended that evening and identifying the telephone number of the caller or recipient of the call. These records provide no information by which the location of the cel may be ascertained other than in connection with completed actual calls made or received. It is this cell site information that Hall seeks to suppress.
*249 Cellular telephone or “wireless” networks, operated by T-Mobile,[1] are divided into geographic coverage areas, or “cells.” Each T-Mobile cell contains an antenna tower that sends a signal to cellular phones on the T-Mobile network through which such telephones may transmit and receive calls while located in such coverage area. The size of a particular T-Mobile cell is determined by a number of factors, including, but not limited to, the radio reception range, the topography of the surrounding land, the presence of buildings, and prevailing weather patterns, and the expected cellular telephone traffic in the area. T-Mobile cell size ranges from several hundred feet[2] in some urban locations, such as portions of Manhattan, to more than 15 miles in suburban and rural areas.
Generally, each T-Mobile antenna tower provides 360 degrees of coverage. As a T-Mobile cell phone and its user move from place to place during a call, the system automatically switches the connection to the T-Mobile cell antenna tower that provides the best reception. For this process to function correctly, each cell phone using the T-Mobile network must periodically transmit a unique identification code to register its presence within each T-Mobile cell. T-Mobile then uses this unique number, together with information identifying the antenna tower to which the cell phone is currently connected, and in many cases, the 120-degree portion or “sector” of the tower facing the cell phone, to route calls to and from the cell phone. Each T-Mobile cell tower is assigned a unique number which is automatically used to route calls and which is recorded in the case of completed calls to indicate the starting and ending cell involved in such call.
Although T-Mobile cellular phones turned on by the user regularly emit signals which are received by the nearest tower, even when no call is being made, unless the subscriber makes a completed call or a completed call is made to such subscriber, T-Mobile’s system does not automatically make or keep any records of such signals or which cell site received such signals and did not, in the case of the cel, make or keep any such records *250 where calls were not made or recorded during the period relevant to this case.
The T-Mobile system has the capacity, however, to allow “pinging” of a T-Mobile telephone which has been turned on by its subscriber, even if the subscriber is not making a call, to determine the cell in which such phone is located at the time of the “ping.” To do so, T-Mobile would have to expressly act to cause its network to do so, but cannot reconstruct such information for periods to when such action was taken. The subpoena neither called upon T-Mobile to “ping” the cel nor is there any evidence that T-Mobile “pinged” the cel to generate the records, or information in question here. Thus, the information which Hall seeks to suppress did not arise from “pinging.”
The People contend that they have met their burden to establish their compliance with the federal Stored Communications Act (SCA) (18 USC § 2703) which they contend provides authorization for the subpoena and the receipt of the subpoenaed information. Hall does not dispute that the People have established compliance with the SCA, which requires “specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought[ ] are relevant and material to an ongoing investigation” (18 USC § 2703 [d]), but argues instead both that such statutory standard falls short of constitutional requirements for the retrieval of cel site data, and further that the cel under the circumstances of this case was a “tracking device,” and that, as a result, the People have not met their obligations under a different federal statute, the Electronic Communications Privacy Act of 1986 (ECPA) (18 USC § 3117 [b]). Under ECPA, the People must seek prior court approval based on probable cause, before they may use a “tracking device.” As a third contention, Hall claims that by obtaining the cell site records, the People invaded the privacy of Hall’s home, as “warrantless monitoring of an electronic tracking device in a private residence which is not open to visual inspection, violates the Fourth Amendment.”
Central to Hall’s second and third contentions is that the cel is a “tracking device.” The People do not contend that they have complied with ECPA, but instead assert that the cel is not a “tracking device” under ECPA and, as a result, compliance with ECPA’s higher standard was unnecessary. As to the claim that obtaining cell site records represented a warrantless monitoring of an electronic tracking device in a private residence, the People counter both that the cel was not a tracking device, and that there was no “monitoring in a private residence.”
*251 As the parties’ positions as to Hall’s second and third contentions turn mainly on whether the cel was a “tracking device,” it is necessary to address such contentions.
Hall’s claim under ECPA must be analyzed under the definition of a tracking device in ECPA. Hall’s Fourth Amendment claim, however, being constitutional, cannot rest alone on such statutory definition of tracking device, as Congress in enacting ECPA may have, as a discretionary matter, balanced privacy interests of individuals against law enforcement’s interest in a way more favorable to privacy concerns than those mandated by the Constitution. Similarly, if, as the People contend, the monitoring of broadcasts to and from cellular phones recorded outside of a person’s home is a matter of federal statutory concern, rather than a constitutional principle (as will be discussed below), Congress may, in its definition of a tracking device in ECPA, set a balance which would have been short of the constitutional balance in favor of privacy mandated by the Fourth Amendment with respect to tracking devices placed in a suspect’s home.
Under ECPA, a tracking device is an electronic device which permits the tracking of a person or thing. Case law has expanded the definition to include devices which fit the definition, even though they were not originally designed or intended to track movement. The ECPA is designed to prevent police authorities from tracking movement through such a device without obtaining prior court approval based on a probable cause standard. The record here does not establish that the cel was designed or intended to be a tracking device but was designed to be a cellular telephone to be used on the T-Mobile network which retained and recorded information within its system, in the regular course of business for billing purposes, which information was disclosed pursuant to the subpoena.
It is also clear that the cel could be transformed into a portion of a device to track the cell in which the cel was located but only if the T-Mobile network was directed to “ping” the cel, so long as the cel was on, and that no such direction or pinging took place. However, the record is also clear that in the T-Mobile network, only the nearest cell tower would register the presence of the pinged cell,[3] thus determining the location of the cell only within an area the size of such cell, and could not determine the *252 direction or speed of the person carrying the cel unless and until that person finished the call in another cell.
To determine what is a tracking device for the purpose of ECPA, it is necessary to look to the purpose of ECPA, its legislative history, cases, and the ordinary meaning of words.
The ECPA was enacted in 1986, which although only 20 years ago, represents an almost antediluvian age with respect to present technology and communications systems. The United States Senate report accompanying adoption of the ECPA, in its glossary of terms, defined an “electronic tracking device” as a one-way radio communication device that emits a signal on a specific radio frequency. This signal can be received by special tracking equipment, and allows the user to trace the geographical location of the transponder. Such “homing” devices are used by law enforcement personnel to keep track of the physical whereabouts of the sending unit, which might be placed in an automobile, on a person, or in some other item.[4]
This almost quaint definition essentially defined the classic “bug” which the police would surreptitiously attach to a car or a person’s clothing to enable them to be followed in real time. It is not surprising that the courts, faced with a more generic statutory definition were able to extend the concept to two-way devices such as cellular telephones which the police now often use to perform the same function as a “bug” placed by them.
Such federal courts routinely require a showing of probable cause under the ECPA as a condition of allowing the police to use cellular telephones as tracking devices on a prospective basis, that is, to gain future information relating to a suspect’s movements. These cases do not address certain differences between the cellular telephone and the classic bug, that is the fact that in most cases the phone subscriber, being aware of his possession of the phone, would not necessarily take it with him at all times and might turn it off for short or extended periods. The courts seem instead to assume that a cell phone owner will keep his telephone on and with him as a general matter, thus making a cellular telephone rigged to show location the functional equivalent of a bug. Because technology has changed the state of the art far from the classic bug, the courts are not of the same mind as to how to interpret ECPA and the results *253 vary among courts. The consensus seems to be that prospective tracking through a suspect’s cellular telephone requires a finding of probable cause under ECPA.
In In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth. (396 F Supp 2d 747 [SD Tex 2005] [hereafter cited as Texas J]), cited by both parties here in support of their positions, the court described the tracking device in such case as follows:
“Tracking devices have progressed a long way. Most agencies now have sophisticated tracking devices that use cell site towers or satellites . . . These types of tracking devices are usually monitored from the law enforcement agency’s office. Through the use of computers, a signal is sent to the tracking device (it is pinged), and the tracking device responds. The signal is picked up using cellular telephone cell sites or satellites. The location of the tracker, and therefore the vehicle, is determined through triangulation and a computer monitor at the agency office shows the location of the vehicle on a map. These tracking devices are very accurate, and can differentiate between a vehicle traveling on an interstate highway or the feeder (service) road. The tracking devices will also provide the direction of travel and the speed the vehicle is traveling.” (Id. at 754.)
Using the technology described, the cellular telephone in question together with the computer, cell sites and satellites and the use of triangulation, the location of the cellular telephone can be tracked in real time. There is no question that the combination of these factors made the operation addressed by the court in Texas I one involving a tracking device.
The record here shows the cel to fall far from this level of convergence with the “bug” problem which ECPA addressed. The record here shows that the T-Mobile system would only, upon “pinging,” determine the single cell tower nearest to the cel, thus precluding any possibility of triangulation which is the basis for all global positioning systems and the court’s decision in Texas I. Even assuming the factual conclusion that a governmental agency had the capacity, using its own computers through the T-Mobile network, to monitor the location of the cel in real time, the facts established at this hearing show that T-Mobile could not, at the time in question, actually have done so and there has been no preservation of data to permit even *254 such a capable governmental agency of now tracking Hall’s movements as so described in Texas I. As the Texas I court said (at 751), “By a process of triangulation from various cell towers, law enforcement is able to track the movements of the target phone, and hence locate a suspect using the phone.” Here such scenario did not create the information which Hall seeks to suppress.[5]
In expanding the concept of a tracking device from the original transponder “bug” to cases where cellular telephones are involved to reflect changes in technology, the courts have determined that, where the cell phone, satellites or cell antennas, and the carrier’s system and computers located at law enforcement offices to “ping,” triangulate and analyze data work together to create the functional equivalent of a bug, the parts may each be treated as a “tracking device.”[6]
The information in question arose from the ordinary use and operation of the cel, and not its putative possible secondary function of a tracking device had the government pinged and triangulated (which it would not have done on the evening of the alleged crime as the police had not ascertained the phone number of the cel until many days later). Thus, for the purposes of ECPA, the cel was not a tracking device.
With respect to Fourth Amendment concerns as to the “intrusion” into Hall’s home, the question is easier. For the same reasons set forth above, the cel could not, on the evening in question, be analogized to a bug, thus differentiating the cel from cases where the People may have bugged a defendant’s home. As there was no triangulation, the subpoenaed records *255 can no more than show that Hall was, at certain times when he used the cel, in the vicinity of his home, and cannot even show whether he was inside or outside of his home at the time of any call. On the other hand, had Hall used a land line from his home, his telephone records would have more accurately shown his whereabouts at home[7] and such records could have clearly been obtained by subpoena without the showing of probable cause. This argument is at best a makeweight, and is hereby rejected.
The Constitutional Standard of the Stored Communications Act
Hall concedes that the People have met the standard which the SCA provides for a subpoena thereunder, but asserts that, as to the cell tower information which Hall seeks to suppress, the SCA is constitutionally insufficient under Fourth Amendment standards. The US Constitution Fourth Amendment, adopted in the eighteenth century, when there were neither telephones, cellular telephones nor an understanding of electronics,[8] provides:
“The right of the people to be secure in their pérsons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or thing to be seized.”
While additions to the judicial gloss on this amendment are constant, certain aspects seem to have evolved over time as they relate to this case.
An initial inquiry is whether the papers (and an attendant information) in question are the property of the person seeking to protect them (including those papers, which another holds for them) under circumstances where there is a reasonable expectation of privacy or whether such papers or information belong to someone else.
It is well settled, for example, that a defendant has no legitimate expectation of privacy and no cognizable Fourth Amendment interest in bank records and, therefore, lacks standing to challenge a subpoena for them. (United States v White, 401 US *256 745 [1971]; see United States v Miller, 425 US 435 [1976]; Matter of Cappetta, 42 NY2d 1066 [1977]; Matter of Shapiro v Chase Manhattan Bank, N.A., 53 AD2d 542 [1976]; Cunningham & Earning v Nadjari, 53 AD2d 520 [1976]; Matter of Democratic County Comm. of Bronx County v Nadjari, 52 AD2d 70 [1976].)
The same principle has been applied to the records of a telephone company relating to a person’s account. (See Smith v Maryland, 442 US 735 [1979]; People v Di Raffaele, 55 NY2d 234 [1982].)
On a parallel track, the electronic emanations from telephones, intercepted or tapped or overheard outside of a person’s house, have not received constitutional protection under the Fourth Amendment. As the Fourth Amendment in the nineteenth century could never have contemplated the interception of electronic waves, where there was no intrusion into a house, it was left to Congress to address the new technology. Congress did, by adopting a series of laws to regulate privacy issues in the electronic and telecommunications areas, and continues to readdress this issue from time to time as technology changes. Central to this regulatory scheme have been the Federal Communications Act enacted in 1934, the ECPA enacted in 1986, the Communications Assistance for Law Enforcement Act of 1994, which strictly regulated the disclosure of the content of electronic communications, and the SCA, enacted in 2006. Congress is at present holding hearings on pretexting and related matters such as the use of data brokers which may lead to further legislation in this area. Hall cites a press report of issues raised at these hearings.
Over the period where Congress has regularly legislated in this area, balancing disclosure and access issues, and expressly providing for stronger privacy rights than in the Fourth Amendment standards under the FCC, rights equal to Fourth Amendment standards in the ECPA and weaker than the Fourth Amendment standards in the SCA, Congress has acted with the assumption that the Fourth Amendment is irrelevant because of the nature of electronics and telephones, relegating the appropriate determination of balancing to Congress to do so by statute, under its powers to regulate interstate commerce.
To support his broad constitutional challenge to the longstanding statutory scheme and understanding of Congress in areas where it has been regularly revisiting issues and legislation, Hall cites a recent Indiana District Court case. (In re *257 United States, 2006 WL 187684, 2006 US Dist LEXIS 45643 [ND Ind 2006]).[9]
In such case, the federal District Court for the Northern District of Indiana upheld a decision of a magistrate, as not being clearly erroneous. The magistrate found that the People had sought both prospective and historical data. The court, after reviewing the federal statutes, concluded that a request under the SCA combined with a request under the pen register statute (which authorized a real time future recording) could not bypass the probable cause requirement. Although there was broad language, the case does not expressly address what historic information may be obtained without showing of probable cause under the SCA in the absence of a pen register and trap and trace device having triangulation capacity.
Thus, this court finds that there is no Fourth Amendment infirmity to the SCA. The Fourth Amendment does not apply to disclosures thereunder because the information, having been gathered by T-Mobile for its own legitimate business purposes, belongs to T-Mobile, not Hall, and because the Fourth Amendment does not apply to the interception of electromagnetic waves outside of a person’s home, so as to constitute the acquisition of such information as a search or seizure. As Hall concedes that the People have followed the standards in the SCA for the subpoena, Hall’s objection to such information is rejected.
As this court finds that the subpoenaed material was properly obtained, no analysis is necessary regarding the subsequent identification evidence nor is it necessary to determine whether there was an independent source to provide the basis for Hall’s arrest.
Hall’s motion is denied.

. The testimony was specific to T-Mobile’s operations and records. As this case relates solely to Hall’s motion to suppress the specific T-Mobile records obtained, this court does not find on the basis of this hearing that all cell phone carriers systems operate in a similar manner as to lead to the same result had the records of a different carrier been in question.

. A city block between numbered streets in Manhattan is, for example, traditionally about 200 feet.

. While there was testimony that during some periods of high cellular telephone usage, a call may be routed through an adjacent tower, rather than through the nearest, Johnson’s testimony made it clear that the times the rel *252 evant calls were made in the middle of the night were not periods of high use, and accordingly only the nearest tower would be recorded as handling actual calls.

. S Rep No. 541, 99th Cong, 2d Sess (1986).

. While it is clear that federal government agencies have the capacity to triangulate from “pinging” cell phones, carriers aire not required to have such a capacity. (See United States Telecom Assn. v Federal Communications Commn., 227 F3d 450 [DC Cir 2000] [discussing that the New York City Police Department request to the Federal Communications Commission (FCC) to require cellular telephone carriers to have the ability to triangulate was rejected].)

. Some courts also require the government to provide the cellular telephone to bring such a system under the ECPA. (See In re Application of United States for Order for Disclosure of Telecommunications Records & Authorizing Use of Pen Register & Trap & Trace, 405 F Supp 2d 435 [SD NY 2005].) Such case, which Hall claims was wrongfully decided,, is the only reported federal case in the district in which this court sits. If such case controls, Hall’s contentions would fail as Hall provided his own cellular telephone. It is therefore not surprising that Hall asserts this case to be wrongfully decided. This court need not determine the correctness of such case as the issue there involved prospective data collection and not historical data from which triangulation site information could not be ascertained, as is the case here.

. Perhaps, if he used a portable telephone, he might even have been outside of his home.

. Benjamin Franklin may have had some understanding of electricity.

. Otherwise, Hall concedes, as the People have urged, that the federal cases address subpoenas for prospective information and do not address constitutional questions of the quantum of support required for a subpoena for historical data, the issue here.