People v Watson (2018 NY Slip Op 05342)





People v Watson


2018 NY Slip Op 05342


Decided on July 18, 2018


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 18, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

WILLIAM F. MASTRO, J.P.
JOHN M. LEVENTHAL
BETSY BARROS
VALERIE BRATHWAITE NELSON, JJ.


2016-01361
 (Ind. No. 22/14)

[*1]The People of the State of New York, respondent,
v
Kevin Watson, appellant.


FisherBroyles, LLP, New York, NY (Timothy C. Parlatore and Robert M. Fantone of counsel), for appellant.
Michael E. McMahon, District Attorney, Staten Island, NY (Morrie I. Kleinbart and Anne Grady of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Richmond County (William Garnett, J.), rendered January 7, 2016, convicting him of criminal possession of a weapon in the second degree and criminal possession of a weapon in the fourth degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress physical evidence, and the denial, without a hearing, of his motion to controvert certain search warrants and to suppress certain physical evidence seized in the execution thereof. By decisions and orders on motion dated February 25, 2016, and July 15, 2016, respectively, this Court, inter alia, granted the defendant's motions to stay execution of the judgment pending the hearing and determination of the appeal.
ORDERED that the judgment is affirmed, and the matter is remitted to the Supreme Court, Richmond County, for further proceedings pursuant to CPL 460.50(5).
The defendant contends that the Supreme Court erred in denying, after a hearing, that branch of his omnibus motion which was to suppress physical evidence. We disagree. The hearing testimony established that plainclothes police officers Frank Muzikar and William Stewart were on patrol in an unmarked vehicle within the confines of the 120th Precinct in Staten Island on the afternoon of October 26, 2013. Having been advised of a recent livery car robbery in the area, the officers were seated in their vehicle near the intersection of Brook Street and Jersey Street when they observed the defendant approach a livery vehicle from the vicinity of 516 Jersey Street and look to the left and right several times before briefly speaking to the driver through the passenger side [*2]window. According to the testimony of the driver, he had been dispatched to 516 Jersey Street to pick up a passenger, and the defendant approached and asked to be driven to Victory Boulevard and Bay Street. The driver advised his dispatcher over the radio, and the dispatcher confirmed the destination. The defendant then entered the front passenger seat of the vehicle.
The officers followed the livery car and observed it make two turns without signaling. At that point, they activated the dome light in their vehicle and pulled the car over. Officer Stewart approached the driver's side of the livery car, while Officer Muzikar approached the passenger side. As he did so, Officer Muzikar observed the defendant holding a cell phone with an image of five firearms on the screen. The officer then noticed the butt of a handgun on the defendant's right hip. He asked the defendant to step out of the car and signaled Officer Stewart to come around the vehicle to assist him. As the defendant exited the vehicle, he advised the officers that he had a gun in his possession. Officer Muzikar recovered a black 9 millimeter Taurus handgun from a holster on the defendant's right hip. The gun had one round of ammunition in the chamber and 10 more rounds in the magazine. An additional magazine with 10 more rounds of ammunition was recovered from the holster.
The defendant then stated that he was a licensed gun owner, that his mother worked with the officers at the police precinct and they should call her, and that he had been on his way to the 120th Precinct station house to turn in the gun for cash at the time he was stopped. Officer Muzikar checked the defendant's gun license and discovered that it pertained to a different weapon—a Glock .45 caliber handgun. The officers also questioned the livery driver, who confirmed that the defendant had asked to be dropped off, not at the local precinct station house, but at the corner of Victory Boulevard and Bay Street. The driver also produced his "trip sheet," on which he had noted that destination. After handcuffing the defendant and placing him under arrest, Officer Stewart conducted a pat-down search of his person and recovered a gravity knife. The officers also seized the defendant's cell phone.
In a written decision, the hearing court denied that branch of the defendant's omnibus motion which was to suppress the seized physical evidence, largely crediting the police officers' account of the incident.
Contrary to the defendant's contention, the Supreme Court properly denied that branch of his omnibus motion which was to suppress the physical evidence. "The credibility determinations of the Supreme Court following a suppression hearing are entitled to great deference on appeal and will not be disturbed unless clearly unsupported by the record" (People v Cuyler, 95 AD3d 900, 900-901 [internal quotation marks omitted]; see People v Casey, 149 AD3d 770, 771; People v Jemmott, 125 AD3d 1005, 1006). " [A]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred,' even if the underlying reason for the stop was to investigate another matter unrelated to the traffic violation" (People v Sluszka, 15 AD3d 421, 423, quoting People v Robinson, 97 NY2d 341, 348-349; see People v Edwards, 14 NY3d 741, 742; People v Foster, 153 AD3d 853, 853; People v Diaz, 146 AD3d 803, 804). Here, the court properly credited the police officers' testimony that they observed the livery vehicle in which the defendant was a passenger make two turns without signaling, which justified the stop of the vehicle for the commission of a traffic infraction (see Vehicle and Traffic Law § 1163[a]; People v Guthrie, 25 NY3d 130, 133; People v Patron, 141 AD3d 545, 545; People v Davis, 103 AD3d 810, 811; People v Glover, 84 AD3d 977, 978). Officer Muzikar's observation of the butt of a gun protruding from the defendant's hip area, as well as the [*3]defendant's statement that he had a gun in his possession, provided the police with probable cause to place the defendant under arrest and to conduct the ensuing search (see People v Baksh, 125 AD3d 988, 989; Matter of Jashaun A., 122 AD3d 833, 833-834; People v Hill, 72 AD3d 702, 705; People v Edwards, 222 AD2d 603, 604). Contrary to the defendant's contention, the hearing testimony of the police officers was not manifestly incredible or patently tailored to nullify constitutional objections (see People v McKenzie, 148 AD3d 936, 937; People v Boyd, 136 AD3d 935, 936; People v Cruz, 131 AD3d 706, 706; People v Abraham, 111 AD3d 756, 757), and the mere fact that the livery driver testified that he followed his usual practice of signaling when making turns does not warrant a contrary finding. Accordingly, the court properly denied suppression.
Further, the Supreme Court properly denied, without a hearing, the defendant's motion to controvert the warrants authorizing the search of his cell phone, since the defendant failed to make the requisite substantial preliminary showing that the warrants were based upon affidavits containing statements that were knowingly or intentionally false or made with reckless disregard for the truth (see People v Alfinito, 16 NY2d 181, 186; People v Moshier, 110 AD3d 832, 833; People v McGeachy, 74 AD3d 989, 990; People v Novick, 293 AD2d 692, 692). The court correctly determined that, notwithstanding some relatively minor alleged discrepancies in the supporting affidavits, none of the arguments proffered by the defense undermined the credibility of those police affidavits regarding the observation of a photographic image of firearms on the screen of the defendant's cell phone. In short, the evidence presented to the issuing magistrate and properly credited by the Supreme Court sufficed to establish probable cause for the issuance of the challenged warrants (see People v Tambe, 71 NY2d 492).
The defendant further contends that the Supreme Court erred in admitting into evidence at trial two unredacted photographs discovered on the defendant's cell phone that displayed what appeared to be multiple handguns. The first photograph, which depicted what appeared to be five firearms, was the same image that Police Officer Muzikar initially observed on the defendant's cell phone at the time he approached the livery vehicle. The second photograph depicted what appeared to be four guns and had been taken several months prior to the defendant's arrest. Significantly, the defendant did not challenge the introduction of the photographs to the extent that they depicted either the .45 caliber Glock handgun for which he possessed a premises permit, or the 9 millimeter Taurus handgun which he possessed at the time of his arrest. However, the defendant argued that the images of the other firearms should be redacted from the photographs, since they would unfairly suggest that he had a propensity to illegally possess handguns. The court ultimately rejected the argument, reasoning that the probative value of the unredacted photographs outweighed their prejudicial effect because they would complete Officer Muzikar's narrative regarding the image he observed on the defendant's cell phone when he approached the livery vehicle, and the photographs would also be relevant in negating the defendant's assertion that, despite being an avid gun enthusiast, he had intended to surrender part of his collection through a gun buy-back program at the time of his arrest. The court further indicated that it would provide the jurors with a limiting instruction regarding the photographs, directing that they could not be considered as evidence of the defendant's general propensity to commit the offense of criminal possession of a firearm. The court subsequently instructed the jury in this fashion.
Evidence of uncharged crimes is inadmissible when it is proffered solely to establish an accused's propensity to commit crime (see People v Agina, 18 NY3d 600, 603; People v Arafet, 13 NY3d 460, 464-465; People v Alvino, 71 NY2d 233, 241; People v Fiore, 34 NY2d 81, 84). However, such evidence may be received to establish an element of the charged crime, or because [*4]it is relevant to some other material issue in the case (see People v Dorm, 12 NY3d 16, 19; People v Alvino, 71 NY2d at 241; People v Lewis, 69 NY2d 321, 325; People v Allweiss, 48 NY2d 40, 46-47; People v Molineux, 168 NY 264, 291-294). If the proffered evidence is probative of a relevant issue, the court must then engage in a discretionary balancing of its probative value and the need for the evidence against the potential for prejudice to the defendant (see People v Morris, 21 NY3d 588, 595; People v Dorm, 12 NY3d at 19; People v Alvino, 71 NY2d at 242; People v Ventimiglia, 52 NY2d 350, 359; People v Allweiss, 48 NY2d at 47). Here, while the unredacted photographs at issue bore some marginal relevance to the testimony in this case, we agree with the defendant that said relevance was outweighed by the potential for prejudice arising from the depiction of what appeared to be other firearms in the photographs. However, while the Supreme Court improvidently exercised its discretion in declining to redact the subject photographs, we disagree with our dissenting colleague that the defendant was "severely prejudiced" by the error. Rather, we conclude that the evidence of the defendant's guilt, without reference to the error, was overwhelming, and there was no significant probability that the jury would have acquitted the defendant had it not been for the error (see People v Arafet, 13 NY3d at 467-468). During his opening statement, defense counsel conceded that the defendant told the arresting officers that he possessed the gun without a license. Further, the defendant's statement to the officers that he was on his way to surrender the gun at the precinct station house was refuted, inter alia, by the manner in which he carried the loaded gun in a holster on his hip, and by the fact that he provided the livery driver with a destination other than the precinct station house. Indeed, these circumstances were utterly at odds with his claim of innocent possession (see generally People v Banks, 76 NY2d 799). Accordingly, the error was harmless (see e.g. People v Gillyard, 13 NY3d 351, 356; People v Littlejohn, 112 AD3d 67, 77).
The defendant additionally contends that the Supreme Court erred in prohibiting him from cross-examining Officer Muzikar regarding the underlying facts of three settled federal civil rights lawsuits that had been commenced against him and other members of the New York City Police Department, since they allegedly bore some relevance to Officer Muzikar's credibility and purported bias. After reviewing the complaints and stipulations of settlement in those cases, the court determined that such questioning would be inappropriate given the general and conclusory nature of the allegations in the civil rights lawsuits and the lack of any specific wrongdoing alleged against Officer Muzikar individually therein. The court reasoned that the proposed questioning would have only slight probative value, which would be outweighed by the strong potential for prejudice given the disproportionate significance which the lawsuits might be accorded.
It is a settled principle that "law enforcement witnesses should be treated in the same manner as any other witnesses for purposes of cross-examination" (People v Smith, 27 NY3d 652, 661-662). Thus, subject to the broad discretion of the trial court in supervising cross-examination, "specific and relevant allegations of misconduct in a civil action filed against a law enforcement officer may be used for the limited purpose of impeaching that law enforcement witness at trial" (People v Casey, 149 AD3d at 772; see People v Garrett, 23 NY3d 878, 886). Where, as in the present case, the underlying civil actions proffered as impeachment material have been settled without any admission of wrongdoing, a defendant is not permitted to ask the police witness whether he has been sued, whether the case was settled, or whether the underlying criminal charges relating to the plaintiffs in the civil actions were dismissed. However, in such cases, "defendants should be permitted to ask questions based on the specific allegations of the lawsuit if the allegations are relevant to the credibility of the witness" (People v Smith, 27 NY3d at 662). An assessment of the propriety of such questioning requires that defense counsel first "present a good faith basis for inquiring, namely, the lawsuit relied upon; second, specific allegations [from the lawsuit] that are [*5]relevant to the credibility of the law enforcement witness must be identified; and third, the trial judge [must exercise] discretion in assessing whether inquiry into such allegations would confuse or mislead the jury, or create a substantial risk of undue prejudice to the parties" (id.; see People v Enoe, 144 AD3d 1052, 1053-1054).
Applying the foregoing criteria to the present matter, we conclude that the Supreme Court did not improvidently exercise its broad discretion in precluding defense counsel from inquiring into the underlying facts of two of the three federal lawsuits at issue. The complaints in those actions only contained broad conclusory allegations of unlawful police action by large groups of officers, and did not set forth specific acts of misconduct against Officer Muzikar individually. Since "the specific allegations must be relevant to [the] witness's credibility" (People v Smith, 27 NY3d at 662), we decline to disturb the court's discretionary ruling with respect to those matters (see e.g. People v Andrew, 54 AD3d 618, 618-619). However, we further conclude that the court improvidently exercised its discretion in precluding cross-examination of Officer Muzikar as to the underlying facts of the third lawsuit. The complaint in that lawsuit specifically alleged that Officer Muzikar and two fellow officers pulled the plaintiffs' vehicle over, ordered the plaintiffs out of their car, and conducted a search of the vehicle without probable cause. Moreover, upon recovering a small folding knife from the glove compartment, the officers allegedly falsely claimed that the object was in fact a gravity knife, and placed the plaintiffs under arrest for its possession. In our view, these specific allegations of misconduct, focusing on Officer Muzikar individually, were proper material for defense counsel's efforts to impeach the officer at trial, and the proposed questioning with regard to the underlying facts of this lawsuit should have been permitted (see People v Smith, 27 NY3d 652; People v Enoe, 144 AD3d 1052).
Nevertheless, for the reasons discussed previously, we find that the error was harmless under the circumstances of this case. Indeed, even if the questioning with respect to all three of the federal lawsuits should have been permitted, the evidence of the defendant's guilt was overwhelming. The defendant did not contest Officer Muzikar's testimony that the defendant admitted his unlicensed possession of the subject handgun and told the officers that he was on his way to turn in the weapon at the precinct station house at the time of his arrest. Accordingly, there is no significant probability that the jury would have acquitted the defendant had defense counsel been permitted to impeach Officer Muzikar with regard to the facts underlying any or all of the federal lawsuits (see People v Smith, 27 NY3d at 665, 670; see generally People v Kello, 96 NY2d 740, 744).
The defendant next contends that the Supreme Court improperly curtailed his questioning of a defense witness regarding a statement the defendant allegedly made to the witness, and regarding conversations that witness allegedly engaged in with the defendant regarding New York's gun buyback program. By way of background, we again observe that, during its direct case, the prosecution elicited testimony from Officer Muzikar that when the defendant exited the livery vehicle at the direction of the officers, he advised them that he was carrying a gun and that he was on his way to the precinct station house to turn the gun in for payment under the buyback program. Since this police testimony effectively raised on behalf of the defendant the defense of temporary lawful possession of the handgun pursuant to the exemption from criminal liability for a person engaged in the voluntary surrender of a weapon to the authorities (see Penal Law § 265.20[a][1][f]), the burden was on the prosecution to disprove the defense beyond a reasonable doubt (see Matter of Nikim A., 179 AD2d 638, 639; People v Roccaforte, 141 AD2d 775, 775; People v Montgomery, 106 AD2d 410, 411). The prosecution sought to sustain this burden by eliciting evidence [*6]demonstrating, inter alia, that the defendant's destination in the livery car was not the precinct station house, but an intersection bordering a public park that was located approximately one-half mile from the precinct station house. Similarly, the prosecution presented evidence that the defendant was wearing the handgun in a holster on his hip, and that the gun was loaded with a total of 11 rounds of ammunition, with an additional magazine containing 10 more rounds in the holster, circumstances which reasonable jurors could determine were inconsistent with the imminent surrender of the firearm to the police.
At the conclusion of the direct case, the prosecution rested and the jury was returned to the jury room so that the Supreme Court could consider defense motions and schedule the remainder of the trial. When the court asked defense counsel whether he intended to present any witnesses, counsel referred to a witness list. The court then asked for an offer of proof, stating "I want to know what they're being called for. For example, people cannot take the witness stand and say that the defendant called me and told me I was going—I was on my way to the 120 Precinct to hand in the gun. That would be inadmissible hearsay." Defense counsel conceded that he had intended to elicit such testimony from the defendant's wife and from Crystal Armstrong, the defendant's mother-in-law and an employee at the 120th Precinct station house. Counsel disagreed with the court's view, insisting, as he does on appeal, that testimony by Armstrong regarding such a statement by the defendant would be admissible as a prior consistent statement to rebut an allegation by the prosecution of a recent fabrication by the defendant. Following a lengthy discussion of the issue on the record, the court held that the proffered testimony by Armstrong with respect to the defendant's previous statements to her would not be admitted as a prior consistent statement.
At the outset, we disagree with the defendant's contention, and the position of our dissenting colleague, that the Supreme Court's ruling with regard to potential hearsay testimony by Armstrong was biased and procedurally inappropriate because it was not preceded by an objection or motion in limine by the prosecution. A trial court enjoys "broad authority to control the courtroom, rule on the admission of evidence, elicit and clarify testimony, expedite the proceedings and to admonish counsel and witnesses when necessary'" (Porter v Saar, 260 AD2d 165, 167, quoting Campbell v Rogers & Wells, 218 AD2d 576, 579). This authority "to control the conduct of the trial" (Chary v State of New York, 265 AD2d 913, 914) encompasses "broad discretion in controlling the scope of direct, cross, and redirect questioning" (Caserta v Levittown School Dist., 12 AD3d 549, 550; see Georgescu v City of New York, 107 AD3d 946, 947), including placing limits on the examination of a witness where appropriate (see People v Cain, 34 AD3d 1256; People v Duran, 6 AD3d 809, 810; Ingebretsen v Manha, 218 AD2d 784). Here, the court appropriately exercised its broad discretion by preventing inadmissible hearsay testimony from being elicited at trial, thereby avoiding any improper influence such evidence might have had on the jury. The court was not required to passively await an attempt to elicit such inadmissible testimony before the jury, and the inevitable objection by the prosecution that would follow, before ruling on the issue. Similarly, the court's action did not blindside the defense. Rather, the trial record demonstrates that the court expressed its concern over the potential hearsay problem in advance of the witness taking the stand and patiently discussed the issue at length with counsel outside the jury's presence before finalizing its ruling and resuming the trial. Contrary to the defendant's current contention, and the position of our dissenting colleague, the court properly ruled that the proffered hearsay testimony regarding statements made by the defendant to Armstrong was not admissible under a prior consistent statement theory.
"A witness' trial testimony ordinarily may not be bolstered with pretrial statements (People v McClean, 69 NY2d 426, 428; see People v Singer, 300 NY 120, 123-124; People v O'Sullivan, 104 NY 481, 486). Several rationales underlie the rule: untrustworthy testimony does not become less so merely by repetition (People v McClean, 69 NY2d at 428, supra); testimony under oath is preferable to extrajudicial statements (Crawford v Nilan, 289 NY 444, 451); and litigations should not devolve into contests as to which party could obtain the latest version of a witness' story (id. [at 451])" (People v McDaniel, 81 NY2d 10, 16). However, a recognized exception to the prohibition against such bolstering "permits evidence of prior consistent statements when the witness' testimony is assailed as a recent fabrication" (People v Mclean, 69 NY2d at 428), provided that the proffered prior consistent statement was made at a time before the motive arose for the witness to testify falsely.
Initially, the use of a prior consistent statement to rehabilitate the credibility of a testifying defendant has no application in this case for the simple reason that this defendant did not take the stand and testify at any point in this matter. Indeed, Guide to New York Evidence rule 8.31 (Prior Consistent Statement) clearly contemplates that such rehabilitation is only available to a witness who has given testimony at the proceeding: "A statement of a witness made prior to his or her testimony and consistent with that testimony is admissible when offered to rebut an express or implied claim of recent fabrication and when the statement was made prior to the circumstances supporting that claim" (emphasis added). Furthermore, the testimonial nature of the rule is reinforced by relevant case law, which consistently has limited the proper admission of prior consistent statements to those instances where a witness has taken the stand and subjected himself to the crucible of cross-examination, during which the adverse party has sought to impugn the credibility of the witness by suggesting that the testimony is the product of a recently acquired motive to lie (see e.g. People v Smith, 22 NY3d 462, 465-466 ["(p)rior consistent statements will often be less prejudicial to the opposing party than other forms of hearsay, since by definition the maker of the statement has said the same thing in court that he said out of it, and his credibility can be tested by cross-examination" (emphasis added)]; People v Buie, 86 NY2d 501, 510 ["the prior consistent statement prohibition and exception are anchored to the impeachment and rehabilitation of witnesses" (emphasis added)]; People v McDaniel, 81 NY2d at 18 ["(i)f upon cross-examination a witness' testimony is assailed . . . as a recent fabrication, the witness may be rehabilitated with prior consistent statements that predated the motive to falsify" (emphasis added)]; People v McClean, 69 NY2d at 428 ["if the cross-examiner seeks to impeach the witness by evidence tending to show that his testimony is of recent invention . . , the party calling the witness . . . may show that the witness made statements similar to his trial testimony at some earlier time when he was free from the alleged bias" (emphasis added)]; Ferris v Sterling, 214 NY 249, 254 ["where the testimony of a witness is assailed as a recent fabrication, it may be confirmed by proof of declarations of the same tenor before the motive to falsify existed" (emphasis added)]).
Here, as an essential part of its case-in-chief, the prosecution elicited, through the testimony of a police officer, the defendant's statement regarding his intent to surrender the gun. As was his right, the defendant elected not to take the stand and subject himself to cross-examination, instead relying upon the officer's testimony to establish his defense of temporary lawful possession of the weapon. Having so elected, he foreclosed any possibility that the prosecutor would cross-examine him and challenge his defense as a recent fabrication during such questioning. Thus, since the requisite claim of a recent fabrication was absent, the defendant could not adduce evidence of a prior consistent statement to rebut it (see People v Gross, 26 NY3d 689, 694 ["it is generally improper to introduce testimony that the witness had previously made prior consistent statements, [*7]when there is no claim of either prompt outcry or recent fabrication"]; People v Buie, 86 NY2d at 510 [prior consistent statement evidence "may be admissible, but only to rebut a claim of recent fabrication"]; People v McClean, 69 NY2d at 428 ["(a)n impeached witness cannot be rehabilitated by his antecedent consistent statements unless the cross-examiner has created the inference of, or directly characterized the testimony as, a recent fabrication"]). In this regard, the defendant's assertion that, during her opening statement, the prosecutor accused him of a recent fabrication is without merit. Rather, the prosecutor merely proposed to the jury that the defendant's claim that he was going to the precinct station house to surrender the gun would be contradicted by the livery driver's testimony regarding the different destination to which the defendant had asked to be driven. Such an opening statement is not the evidentiary equivalent of confronting the defendant on cross-examination with a claim of recent fabrication and thus lacks the testimonial element required for the admission of a prior consistent statement. Moreover, the prosecutor never accused the defendant of recently altering his account or concocting a new explanation for his possession of the gun, but instead maintained that the defendant's explanation had been false from its inception (see generally People v Singer, 300 NY at 124 [a recent fabrication arises where the cross-examiner "is charging the witness not with mistake or confusion, but with making up a false story well after the event" so as to suggest that his testimony "(has been) fabricated to meet the exigencies of the case"]). Under these circumstances, the use of an alleged prior consistent statement to rehabilitate the defendant's credibility was unavailable (see People v McDaniel, 81 NY2d at 18; People v Davis, 44 NY2d 269, 277-278).
Despite acknowledging the facial inapplicability of the prior consistent statement rule to this case, our dissenting colleague nevertheless posits that the defendant's argument in this regard is persuasive because the rationale for the admission of such a statement is present here, and it was "unjust" to exclude it. We merely note in response that the admissibility of the statement must be governed by the rules of evidence. It would be manifestly unfair to permit the defendant to present a statement that he made at the time of arrest through the testimony of a police officer, thereby insulating the defendant from cross-examination as to the truth of that statement, and to then allow the defendant to bolster the credibility of that statement through the introduction of hearsay testimony from yet another witness.
Unlike the defendant, who solely relies on an inapplicable prior consistent statement analysis in contending in his appellate brief that it was error to exclude evidence of the statement he allegedly made to Armstrong, our dissenting colleague instead primarily argues that Armstrong's proffered testimony regarding the defendant's alleged statement to her of his intention to surrender the gun should have been admitted as evidence of the defendant's state of mind rather than for the truth of its contents, thereby obviating any hearsay objection. However, the defendant never advanced this "state of mind" argument at the trial level, nor does he currently contend on this appeal that his purported statement to Armstrong should have been admitted as evidence of his state of mind. Accordingly, this issue is both unpreserved for appellate review (see CPL 470.05[2]; People v Moore, 66 AD3d 707, 710, affd 15 NY3d 811) and not before this Court for consideration on the present appeal (see Misicki v Caradonna, 12 NY3d 511, 519; Crane, A.G. v 206 W. 41st St. Hotel Assoc., L.P., 87 AD3d 174, 179; People v Moore, 66 AD3d at 710). We further note that "the statement was irrelevant unless offered to prove the truth of the matter asserted . . . and for that purpose it was inadmissible hearsay" (People v Reynoso, 73 NY2d 816, 819).
The defendant does presently argue a "state of mind" hearsay exception with respect to the Supreme Court's expansion of its ruling to also prohibit testimony regarding any discussions [*8]between Armstrong and the defendant about the topic of surrendering a gun under the buyback program, an analytically distinct aspect of Armstrong's potential testimony which our dissenting colleague conflates with the defendant's prior consistent statement. However, despite the court's request for an offer of proof as to Armstrong's anticipated testimony, defense counsel never proffered evidence of any such conversations or discussions which he intended to elicit from her. Rather, counsel advised the court that, in addition to having Armstrong testify for the purpose of relating the defendant's prior consistent statement, his offer of proof was that she would also be asked only to authenticate photographs that she took of gun buyback posters that were displayed in public areas of the precinct station house, testimony which the court agreed would be proper. At that point, the court instructed Armstrong that she could not testify as to the defendant's prior consistent statement to her, and that she was further prohibited from testifying "to any conversations that you initiated with him. So no conversations back and forth will be allowed." Significantly, defense counsel voiced no objection of any kind to this additional restriction, thereby suggesting that he had no evidence of such conversations to offer, and instead went on to elicit testimony from Armstrong regarding the buyback program, the prominent display of the program posters at the precinct station house, and the defendant's visits to the precinct station house while the posters were displayed there. Accordingly, the defendant's current contention, raised for the first time on appeal, that the court should have permitted unoffered evidence of unspecified discussions between Armstrong and the defendant regarding the buyback program under a "state of mind" hearsay exception, is unpreserved for appellate review (see CPL 470.05[2]; People v Gurdon, 153 AD3d 1430; People v Pickett, 153 AD3d 940). The defendant's failure to place this issue on the record precludes our effective review of the speculative arguments he now makes in this regard.
We note that our dissenting colleague's suggestions that such testimony was actually offered by the defense, and that defense counsel actually argued at trial that it was admissible to establish the defendant's state of mind (see generally People v Ricco, 56 NY2d 320, 328; People v Gibian, 76 AD3d 583, 585; People v Kass, 59 AD3d 77, 86-87), are without support in the record. Rather, the record reveals that, as a brief afterthought to his lengthy and legally inapposite "prior consistent statement" argument, defense counsel made only a conclusory assertion that his client's statement to Armstrong would constitute admissible nonhearsay. Significantly, defense counsel at no point in the trial posited that any testimony by Armstrong regarding conversations with the defendant should be admitted to prove the defendant's state of mind. Moreover, the mere perfunctory utterance that a statement was "not hearsay" or was "nonhearsay" completely failed to apprise the Supreme Court that the defendant was invoking the state of mind exception to the hearsay rule.
Likewise, our dissenting colleague's alternative reasoning—that any attempt by defense counsel to make an offer of proof regarding Armstrong's testimony or to preserve this "state of mind" argument at trial was somehow "preempted" by the court's evidentiary ruling—is unpersuasive. Indeed, rather than foreclosing any further discussion of the matter following its initial ruling, the court patiently continued to hear, over two days of trial, encompassing some 13 pages of the trial transcript, defense counsel's arguments regarding the admissibility of Armstrong's hearsay testimony. During that argument, defense counsel did in fact provide the court with an offer of proof as to other matters to which Armstrong would testify, but made no mention of any conversations she specifically initiated with the defendant. Thus, the failure to provide such an offer of proof and to preserve the "state of mind" contention was not caused by any lack of receptiveness on the part of the court, but was instead attributable to defense counsel's failure to bring these matters to the court's attention despite having ample opportunity to do so. Given these shortcomings, the analysis [*9]by the defendant and our dissenting colleague of what Armstrong might have testified to, and the significance that such theoretical testimony might have had on the case, is speculative. Simply put, the current arguments of the defendant and our dissenting colleague in this regard cannot be evaluated in the absence of an offer of proof as to what Armstrong's proposed trial testimony would have been, and an assertion at trial that such proffered testimony, whatever it might be, would have been admissible pursuant to the state of mind exception. Accordingly, the court's ruling with regard to Armstrong's testimony most assuredly did not deprive the defendant of his right to present a defense—it merely prevented him from eliciting his own hearsay statements through the testimony of his mother-in-law, rather than by taking the stand and testifying to any such conversation himself. While the defendant clearly was not required to testify at trial, he is required to live with this consequence of his decision not to do so.
Contrary to the defendant's further contention, the Supreme Court appropriately limited the defense summation to matters of evidence that were properly adduced at trial (see People v Romano, 301 AD2d 666, 667). The court also properly sustained the prosecutor's objections to defense summation comments that were based on wholesale speculation, violated the court's evidentiary rulings, or were not fair comment on the evidence (see People v Paixao, 23 AD3d 677, 678; People v Bistonath, 216 AD2d 478, 479; People v Barreau, 183 AD2d 904).
As the People correctly concede, the prosecutor's comment that defense counsel "can't lie to a jury," made during an exchange with defense counsel following an objection to the defense summation, was improper. However, this single remark did not deprive the defendant of a fair trial. Moreover, the effect of the remark must be evaluated in the context of the defense summation, wherein counsel repeatedly accused the arresting officer of lying and suggested that the defendant's wife may have possessed a license for the subject handgun or other handguns depicted in prosecution exhibits—a completely speculative and unsupported assertion which prompted the prosecutor's objection in the first instance. The effect of the remark must further be considered in light of the corrective action taken by the Supreme Court in response to the prosecutor's remark (see People v Galloway, 54 NY2d 396; People v Peters, 98 AD3d 587, 589; People v Johnson, 154 AD2d 618, 619; People v Gilmore, 106 AD2d 399). We conclude that any error in regard to the remark was harmless (see People v Roscher, 114 AD3d 812; People v Littlejohn,112 AD3d at 77). Indeed, the evidence of the defendant's guilt was overwhelming, and in view of the trial court's subsequent instruction to the jury, there was no significant probability that the jury would have acquitted the defendant had it not been for the error (see People v Crimmins, 36 NY2d 230, 242; People v Davis, 39 AD3d 873, 875; People v Roccaforte, 141 AD2d at 776).
Finally, we find unpersuasive the defendant's contention that his sentence of a 5-year determinate term of imprisonment for criminal possession of a weapon in the second degree was excessive. Pursuant to Penal Law § 70.02(3)(b), the defendant faced a determinate term ranging from 3½ to 15 years for this Class C violent felony offense. The record of the sentencing proceeding demonstrates that the prosecution requested the imposition of an 8-year term, while the defendant sought the legal minimum of 3½ years. The Supreme Court carefully reviewed the presentence report, in which the defendant gave a statement insisting that he had been taking the handgun to the 120th Precinct station house as part of his charitable work for the Masonic Fraternity, that he had been transporting the gun in a bag, and that the police officers who pulled over the livery vehicle in which he was riding took the gun from the bag and placed it on his hip before arresting him. The defendant further stated during the presentence interview that the officers destroyed paperwork that he provided to them proving that the gun did not belong to him, called him a racial slur, and stated [*10]that he was being arrested because one of the officers needed a "collar" to achieve the rank of detective. Additionally, the court was aware that the defendant was a gainfully employed, 34-year-old married man with no previous criminal record.
In imposing sentence, the Supreme Court heard arguments from the prosecution and the defense, and then observed that from the outset of the case, the defendant had sought to avoid responsibility for his criminal conduct through various means—by claiming that he was licensed to carry the gun, by invoking the influence of his mother-in-law who worked at the precinct station house, and by falsely claiming that he was surrendering the gun to the authorities even though he was wearing the loaded weapon on his hip and was traveling to a destination other than the precinct station house at the time of his arrest. These circumstances were particularly disturbing given that the defendant was employed in the security business and already possessed a premises permit for a different, lawfully registered handgun, indicating that he was well aware of gun licensing requirements and nevertheless disregarded them in this case. The court further observed that the defendant had a gravity knife on his person, and that his continuing explanations for his possession of the handgun were patently false and manifestly contradicted by logic and the evidence. Weighing the defendant's lack of a criminal background, his failure to take responsibility for his offenses, and his lack of remorse, the court imposed the five-year term as a sentence which reflected the serious nature of the crime while acknowledging the defendant's status as a first-time offender.
Since the Supreme Court carefully weighed the appropriate factors in reaching its sentencing determination (see People v Young, 94 NY2d 171, 181-182; People v Farrar, 52 NY2d 302, 305-306), we discern no improvident exercise of discretion in the sentence imposed by the court. Moreover, upon our consideration of all relevant sentencing factors, we do not find the sentence to be excessive.
MASTRO, J.P., LEVENTHAL and BRATHWAITE NELSON, JJ., concur.
BARROS, J., dissents, votes to reverse the judgment, on the law, and order a new trial, with the following memorandum:
I respectfully dissent and vote to reverse the judgment of conviction because the Supreme Court's erroneous rulings that (1) sua sponte precluded certain testimony of defense witnesses, (2) limited defense counsel's cross-examination of an arresting officer, (3) allowed the introduction into evidence of unredacted photographs suggesting that the defendant was guilty of similar uncharged crimes, and (4) curtailed defense counsel's summation, deprived the defendant of his constitutional rights to present a defense and a fair trial. In any event, the imposition of a 5-year determinate term of imprisonment was unduly harsh and severe, and I would vote to reduce the sentence to the minimum of a 3½-year determinate term of imprisonment.
At trial, the People presented evidence that at approximately 3:10 p.m. on October 26, 2013, Police Officers Frank Muzikar and William Stewart of the Staten Island Gang Squad became suspicious of the defendant when they observed him enter the front seat of a livery cab. The officers claimed that they stopped the livery cab after it made two turns without signaling. After approaching the vehicle, Officer Muzikar purportedly noticed the butt of a gun protruding from the defendant's waistband. The defendant informed the officers that he was in possession of the gun, and that, among other things, he was on his way to the 120th Precinct station house, where his mother worked, to surrender the firearm as part of the New York City Police Department's Gun [*11]Buyback Program. The People argued, inter alia, that the defendant's excuse was a fabrication, and that he was not on his way to the precinct station house.
Penal Law § 265.20(a)(1)(f) provides an exemption or immunity from prosecution to a person who voluntarily surrenders a firearm under procedures and protocols established by local law enforcement officials. The New York City Police Department implemented Penal Law § 265.20(a)(1)(f) by establishing a Gun Buyback Program whereby the police department pays $100 to any individual turning in a qualifying weapon to any precinct, allows such individuals to surrender such weapon at any time, and asks no questions of such individuals. Since the defendant raised the exemption under Penal Law § 265.20(a)(1)(f) as his defense, the People were required to disprove the exemption beyond a reasonable doubt (see generally People v Santana, 7 NY3d 234, 236-237; People v Kohut, 30 NY2d 183, 187; see also Matter of Nikim A., 179 AD2d 638, 639; People v Roccaforte, 141 AD2d 775, 775; People v Montgomery, 106 AD2d 410, 411; William C. Donnino, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law § 265.20 at 412 [2017 ed]).
After the People rested their case, the defendant sought to call witnesses to testify regarding, among other things, pre-arrest conversations about the defendant's intention to surrender the gun at the 120th Precinct station house pursuant to the Gun Buyback Program. One of those proposed witnesses, Crystal Armstrong, was a senior police administrative aid at the 120th Precinct station house who had been employed by the New York City Police Department for 27 years, and was the defendant's mother-in-law. Indeed, in its case-in-chief, the prosecution introduced the statement the defendant made at the time of his arrest, in which he indicated that his "mother" worked at the 120th Precinct station house. The defendant's witness list included both of the proposed witnesses, Armstrong and the defendant's wife, and the prosecutor never moved to preclude or limit those witnesses' testimony. Even so, when defense counsel informed the Supreme Court that he intended to call those witnesses, the court, sua sponte, ruled that testimony regarding any of the proposed witnesses' conversations with the defendant about the defendant's intention to surrender the gun pursuant to the Gun Buyback Program would be precluded on the ground that such testimony would violate the rule against hearsay.
Courts "are not in the business of blindsiding litigants," who expect us to make determinations on rationales advanced by the parties, not arguments their adversaries never made (Misicki v Caradonna, 12 NY3d 511, 519). Given the defendant's statement at the time of his arrest, the prosecution was well aware of the defendant's purpose in calling Armstrong to testify. The majority's assertion that the prosecution would have inevitably objected to Armstrong's testimony is speculative. The prosecution knew the defense theory, knew the identity of the proposed witnesses, did not comment on the Supreme Court's sua sponte ruling, and did not respond to the defendant's argument in opposition to that ruling. The majority's assertion that the court's ruling followed a lengthy and patient discussion of the relevant issues is belied by the record. Rather, the court's sua sponte ruling preceded the discussion. Half-way through the trial and after the prosecution rested, defense counsel was placed in the unenviable position of having to confront the court on a sua sponte ruling that had the effect of eviscerating the defense. Even accepting as true that a trial court's authority to control the conduct of a trial includes raising, on its own, in limine evidentiary objections on behalf of a party, such authority cannot justify a ruling so broad so as to deprive a defendant of the right to present a defense.
Under certain circumstances, the right to present a defense, which is "one of the [*12] minimum essentials of a fair trial'" (People v Gibian, 76 AD3d 583, 585, quoting Chambers v Mississippi, 410 US 284, 294) "encompasses the right to place before the jury secondary forms of evidence, such as hearsay" (People v Gibian, 76 AD3d at 585). The Supreme Court's overly broad preclusion ruling, issued sua sponte, was based upon a mechanistic application of the hearsay rule which, in effect, deprived the defendant of his fundamental right to present a defense (see Chambers v Mississippi, 410 US at 302).
Any difficulty my colleagues have in reviewing the defendant's arguments in support of the admissibility of Armstrong's proposed testimony is a result of the Supreme Court's sua sponte ruling, and not due to the failure of the defendant to properly take exception to that ruling, or make further offer of proof. Indeed, when making its ruling, the court stated, "[p]eople cannot take the witness stand and say that the defendant called me and told me I was going—I was on my way to the 120 Precinct to hand in the gun. That would be inadmissible hearsay." That statement by the court preempted the offer of proof that the defendant was asked to make. In response to the court's ruling, defense counsel stated that he "completely disagree[d]," and thus, confirmed that the defendant, in fact, was going to call Armstrong to testify that the defendant told her that he was intending to surrender the gun at the precinct station house. When the court indicated that it was firm in its ruling that the proposed testimony constituted inadmissible hearsay, defense counsel then argued that Armstrong's testimony was admissible as a prior consistent statement to rebut a charge of recent fabrication.
Once the Supreme Court made clear its position that the defendant would not be permitted to elicit any testimony from Armstrong referencing a conversation with the defendant about the Gun Buyback Program, or disclosing the contents of such conversation, defense counsel was not required "to make repeated pointless protests" in order to preserve for appeal all the possible bases for admissibility of the proposed testimony (People v Mezon, 80 NY2d 155, 161; see People v Vargas, 123 AD3d 1149, 1150; People v Florestal, 53 AD3d 164, 168). Thus, contrary to the majority's determination, the defendant was not required to again object when the court informed Armstrong about its ruling and advised her that she "may not testify to any statement made to you by the defendant in regard to his intentions in regard to the weapon, . . . specifically that it was his intention to turn the weapon into the precinct" and, in addition, that she "may not testify to any conversations that [she] initiated with him."
Even so, immediately before Armstrong took the stand, defense counsel argued that Armstrong could testify about a statement made "prior to the arrest and, therefore, it could be considered by the jury the fact it was said and the timeline . . . it's still admissible and nonhearsay for that purpose." Later, defense counsel repeated his arguments that the proposed testimony was "not hearsay" and constituted "admissible nonhearsay." Given the nature of the defendant's innocent possession defense, it was obvious that the defendant was attempting to introduce evidence of his intention or state of mind, and the People lodged no objection to such evidence.
Contrary to the statement of my colleagues in the majority, the defendant continues to argue on appeal that the precluded testimony was probative of his "state of mind." The defendant contends that he sought to "elicit testimony related to Ms. Armstrong's knowledge of [the defendant's] intention to voluntarily surrender a firearm prior to his arrest" (emphasis added).
The Supreme Court's assumption that all of the proposed testimony relating to the defendant's pre-arrest conversations with the proposed witnesses constituted per se inadmissible [*13]hearsay was patently incorrect. The court's evidentiary ruling, in effect, prevented the defendant from offering witness testimony as to (1) what, if anything, the witnesses told the defendant prior to his arrest about the Gun Buyback Program, and (2) what, if anything, the defendant told the proposed witnesses prior to his arrest regarding his intention to avail himself of the program.
Armstrong's proposed testimony about her own statements to the defendant about the Gun Buyback Program do not constitute hearsay. Such testimony may be offered for the effect that her statements had on the defendant's state of mind, not the truth of the matter asserted (see People v Gibian, 76 AD3d at 585; People v Kass, 59 AD3d 77, 86-87). Armstrong's purported statements to the defendant about the Gun Buyback Program would be relevant circumstantial evidence supporting the defendant's claim that he intended to surrender the weapon in accordance with the Gun Buyback Program (see People v Minor, 69 NY2d 779; People v Gibian, 76 AD3d at 585; People v Kass, 59 AD3d at 87).
Armstrong's proposed testimony about the defendant's statements to her regarding his intention to surrender the gun at the precinct station house squarely meets the state of mind exception to the hearsay rule. "It is well recognized that the hearsay rule does not exclude the admission of out-of-court statements demonstrating the state of mind of the declarant when that state of mind is an issue in the case" (People v Chambers, 125 AD2d 88, 91). Moreover, "when a particular act of the declarant is at issue, the declarant's statement of a future intent to perform that act is admissible as proof of the declarant's intent on that issue and as inferential proof that the declarant carried out [or attempted to carry out] his intent" (id. at 91; see Mutual Life Ins. Co. v Hillmon, 145 US 285; People v James, 93 NY2d 620; People v Kimes, 37 AD3d 1, 10; People v D'Arton, 289 AD2d 711, 712-713; People v Malizia, 92 AD2d 154, 159, affd 62 NY2d 755; see also Jerome Prince, Richardson on Evidence § 8-612 at 647 [Farrell 11th ed 1995]; Fed Rules Evid rule 803[3]). Here, the defendant's intention at the time of arrest was the most significant issue in the case. Armstrong's proposed testimony about the defendant's pre-arrest statement of his future intent to surrender the gun to the precinct would be admissible as evidence of the defendant's intent at the time of arrest, and as inferential proof that the defendant was in the process of carrying out his intent when he was arrested.
As argued by the defendant, the issue of whether he could introduce evidence of a pre-arrest statement that was consistent with his statement at the time of his arrest to rebut the People's charge that his statement at the time of his arrest was a fabrication raises a question of first impression. Since Armstrong's proposed testimony about the defendant's statements to her regarding his intent to surrender the gun would be admissible under the state of mind exception to the hearsay rule, I would not reach this issue of first impression. In any event, I disagree with the conclusion of my colleagues in the majority.
As noted by the majority, the use of a prior consistent statement to rehabilitate the credibility of a testifying witness has no application in this case because the defendant did not testify. However, the underlying rationale for the common-law rule which allows the use of a prior consistent statement to rehabilitate the credibility of a testifying witness whose testimony is assailed as a recent fabrication should apply in this situation.
"A witness' trial testimony ordinarily may not be bolstered with pretrial statements" (People v McDaniel, 81 NY2d 10, 16). A recognized exception to the prohibition against such bolstering "permits evidence of prior consistent statements when the witness' testimony is assailed [*14]as a recent fabrication" (People v McClean, 69 NY2d 426, 428). The exception to the rule against admission of prior consistent statements is "rooted in fairness; it would be unjust to permit a party to suggest that a witness, as a result of interest, bias or influence, is fabricating a story without allowing the opponent to demonstrate that the witness had spoken similarly even before the alleged incentive to falsify arose" (People v McDaniel, 81 NY2d at 18). In determining whether a party is assailing a witness's statement as a "recent fabrication," the word "recent" has not been limited to trial testimony, but encompasses statements made before the incentive to falsify arose (see People v Singer, 300 NY 120, 124).
Here, the People introduced evidence that, when the defendant was arrested, he told the police officers that he was on his way to surrender the gun at the 120th Precinct station house pursuant to the Gun Buyback Program, and then assailed the defendant's statement as a fabrication, i.e., a story made up by the defendant in order to avoid the consequences of being found in possession of a gun. Thus, the incentive to falsify arose at the time of arrest. For purposes of evidentiary rules, a criminal defendant who elects not to testify by invoking the privilege against self-incrimination is considered to be an unavailable witness (see People v James, 93 NY2d at 635). Under these circumstances, it would be unjust to permit the People to suggest that the unavailable defendant, as a result of interest, bias, or influence, fabricated a story at the time of his arrest, without allowing the defendant to demonstrate that he had spoken similarly before the incentive to falsify arose (see People v McDaniel, 81 NY2d at 18).
The Supreme Court's error in prohibiting the proposed defense witnesses' testimony was further compounded when, during summation, the prosecutor was permitted to comment, over the defendant's objection, that the defendant's mother-in-law works at the 120th Precinct station house, that the defendant "has a direct line to the precinct," and that he "d[id not] call his mother-in law." Even assuming that the court properly precluded Armstrong from testifying about her pre-arrest conversations with the defendant regarding his intention to surrender the gun at the 120th Precinct station house, it should not have permitted the prosecutor to tell the jury that such a conversation never occurred.
Moreover, these errors became even more prejudicial to the defendant when the jury requested a readback of Armstrong's testimony "regarding the turning in of the firearm if it was ever discussed between her and the defendant on the day of [the] arrest and prior to." Over the defendant's repeated objection to the Supreme Court's evidentiary ruling limiting Armstrong's testimony, the court accurately advised the jury that "[t]here is nothing in the record of the trial in regard to this subject."
Since these errors, in and of themselves, deprived the defendant of his fundamental rights to present witnesses in his own defense and to a fair trial, I would reverse the judgment of conviction and order a new trial (see People v Crimmins, 36 NY2d 230, 238). "The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (id. at 238).
As determined by the majority, the Supreme Court further erred in admitting into evidence two unredacted photographs, which were found on the defendant's cell phone, displaying what appeared to be multiple handguns for which the defendant was not charged (see People v Morris, 21 NY3d 588, 597; People v Agina, 18 NY3d 600, 603; People v Molineux, 168 NY 264; People v Singleton, 139 AD3d 208, 212). Images of unrelated guns on the defendant's cell phone [*15]were not relevant to a determination of whether, at the time of the defendant's arrest, he was in the process of surrendering the subject firearm to the police (see People v Singleton, 139 AD3d at 213). Rather, such evidence only tended to show the defendant's propensity to possess firearms (see id.; People v Mercado, 120 AD2d 619, 620).
Notwithstanding the Supreme Court's limiting instruction to the jury with respect to the unredacted photographs, the impermissible use of these images became the focal point of a heated exchange during the defense summation. Defense counsel argued that the People presented no evidence as to whether the defendant's wife, or anyone else, had a permit for the unrelated guns shown in the photographs. Defense counsel's suggestion that the defendant's wife or anyone else had a gun permit for those guns was improper. Nonetheless, instead of objecting to the improper comment, the prosecutor charged defense counsel with lying to the jury. Such accusation not only disparaged defense counsel, but also insinuated that the prosecutor had information, withheld from the jury, that neither the defendant's wife, nor anyone else, had a permit for the unrelated guns.
As noted by the majority, the Supreme Court improvidently exercised its discretion in prohibiting the defendant from cross-examining Officer Muzikar regarding the underlying facts of one of the settled federal civil rights lawsuits filed against him (see People v Smith, 27 NY3d 652, 662; People v Enoe, 144 AD3d 1052). In that settled lawsuit, the complaint alleged that Officer Muzikar, along with two other officers, pulled the plaintiffs' vehicle over, ordered the plaintiffs out of the vehicle, and conducted an illegal search of the vehicle. The complaint further alleged that the officers falsely claimed that one of the plaintiffs possessed a gravity knife. Since the instant case similarly involves a traffic stop and possession of a gravity knife, the allegations of misconduct against Officer Muzikar in the settled civil suit were proper impeachment material (see People v Smith, 27 NY3d 652; People v Enoe, 144 AD3d 1052).
Since the defendant was deprived of the self-standing right to a fair trial, I need not reach the issue of whether the evidence was overwhelming for purposes of harmless error analysis. Even so, I note that Officer Muzikar's testimony regarding the circumstances of the traffic stop materially differed from the testimony of the livery cab driver, and that all of the evidence pertaining to the manner in which the defendant possessed the gun and gravity knife came from Officer Muzikar.
Further, the Supreme Court erred in curtailing defense counsel from arguing on summation that the defendant directed the livery cab driver to the cross streets of Bay Street and Victory Boulevard as a waypoint to reaching the intended final destination of the 120th Precinct station house. "It is, of course, the right of counsel during summation to comment upon every pertinent matter of fact bearing upon the questions the jury have to decide" (People v Ashwal, 39 NY2d 105, 109 [internal quotation marks omitted]). Counsel "is to be afforded the widest latitude by way of comment, denunciation or appeal in advocating his [or her] cause'" (id. at 109, quoting Williams v Brooklyn El. R.R. Co., 126 NY 96, 103; see Braun v Ahmed, 127 AD2d 418, 421-422).
Contrary to the Supreme Court's ruling, defense counsel's argument did not call for improper speculation. The People introduced evidence that, at the time of arrest, the defendant told the officers that he was on his way to the 120th Precinct station house. The People also introduced a map, which showed that, if the livery cab were to have turned left from Victory Boulevard onto Bay Street, it would be traveling in the most direct route to the precinct station house. Thus, one reasonable inference that may be drawn from the fact that the defendant told the livery cab driver to [*16]go to one location, i.e., the cross streets of Bay Street and Victory Boulevard, and then told the police officers that he was on his way to another location, i.e., the precinct station house, is that the defendant gave the livery cab driver the cross streets, instead of a specific address, as a means of gradually directing the driver to the final destination of the precinct station house. Given all the evidence in the record, including the map, and the testimonies of the livery cab driver and the arresting officer, the jury was free to accept or reject the inference that defense counsel requested that they draw.
In sum, the Supreme Court's rulings preemptively disabled the defendant from putting on a defense. The court precluded the defendant's key witness from corroborating his defense. The defendant was severely prejudiced by the admission into evidence of uncharged crimes. He was not permitted to use proper impeachment material for cross-examination of the arresting officer. On summation, he was not allowed to make fair comment on what was left of the evidence supporting his defense.
Finally, I disagree with my colleagues' determination to affirm the sentence. "An intermediate appellate court has broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range" (People v Delgado, 80 NY2d 780, 783; see CPL 470.15[6][b]; People v Thompson, 60 NY2d 513, 519; People v Kordish, 140 AD3d 981, 982). "Our sentencing review power may be exercised, if the interest of justice warrants, without deference to the sentencing court'" (People v Kordish, 140 AD3d at 982 [emphasis omitted], quoting People v Delgado, 80 NY2d at 783; see People v Diaz, 146 AD3d 803, 805). "In considering whether a sentence is unduly harsh or severe under the circumstances, we exercise our discretion giving consideration to, among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation, and deterrence'" (People v Kordish, 140 AD3d at 982-983, quoting People v Farrar, 52 NY2d 302, 305; see Penal Law § 1.05; People v McConnell, 49 NY2d 340, 346; People v Diaz, 146 AD3d at 805-806). "There is no place in the scheme for punishment for its own sake, the product simply of vengeance or retribution" (People v Oliver, 1 NY2d 152, 160; see Penal Law § 1.05; People v Farrar, 52 NY2d at 305; People v McConnell, 49 NY2d at 346).
Here, the imposition of a five-year determinate term of imprisonment for criminal possession of a weapon in the second degree was unduly harsh and severe. At the time of sentencing, the defendant was a 34-year-old homeowner who resided with his wife in Staten Island, had been gainfully employed as a security professional and assigned to a prominent Manhattan building over an 11-year career, and had no criminal record. Although he did not have a carry permit for a gun, the police department had granted him a premises license.
Contrary to the determination of my colleagues, the defendant's failure to express remorse does not justify a five-year sentence given that (1) the defendant readily admitted at the time of his arrest that he possessed the subject gun; (2) the subject gun was not used in the commission of any other crime; (3) there was no victim harmed as result of the defendant's alleged criminal act; (4) the defendant lacked any criminal record; and (5) the defendant maintained his innocence and appealed his conviction. I do not see how the principal objectives of societal protection, rehabilitation, and deterrence are served by the punishment imposed by the Supreme Court as affirmed by this Court (see People v Farrar, 52 NY2d at 305: People v Oliver, 1 NY2d at 160).
Accordingly, I respectfully dissent, and vote to reverse the judgment and order a new trial on the ground that the defendant was deprived of a fair trial.
ENTER:
Aprilanne Agostino
Clerk of the Court